ELIASON CORPORATION, Plaintiff,

v.

NATIONAL SANITATION FOUNDA-
TION et al., Defendants.

Civ. A. No. 36353.

United States District Court,
E. D. Michigan, S. D.

June 3, 1977.

Lee Boothby, Berrien Springs, Mich., for plaintiff.

Robert G. Cutler, Dykema, Gossett, Spencer, Goodnow & Trigg, Detroit, Mich., for defendants.

## FINAL FINDINGS OF FACT AND CONCLUSIONS OF LAW

JOINER, District Judge.

### Procedural Background

This action was filed on April 14, 1971 against six corporations for profit, three corporations not for profit, and nine individuals. Plaintiff, Eliason Corporation, is a Michigan corporation which manufactures

and sells in interstate commerce walk-in coolers and freezers and related racks and accessories. Most of its sales have been to food stores (e. g., National Tea and A&P).

The complaint alleges that defendants have engaged in a conspiracy to cause purchasers of products "which have a relation to or bear on public health and sanitation to refuse to deal with manufacturers of such products who are not approved by NSF, and to refuse to purchase such products which do not carry the seal of approval of NSF," the "essence" of that conspiracy being "to force a boycott" of products not approved by NSF.

The National Sanitation Foundation is a Michigan non-profit corporation, chartered in 1944. The National Sanitation Foundation Testing Laboratory was chartered as a Michigan profit corporation on December 4, 1952; on May 11, 1961, its status was changed to that of a non-profit corporation.

Clark Equipment Company is a Delaware corporation, with its principal office located in the City of Buchanan, State of Michigan. In 1963, Clark acquired Tyler Corporation, and the Tyler Refrigeration Division of Clark is engaged in Niles, Michigan, in the manufacture and marketing of refrigerators and coolers in the State of Michigan and other states.

Hobart Corporation (formerly called "The Hobart Manufacturing Company") is an Ohio corporation which is registered to do business in the State of Michigan and has a registered office in the State of Michigan. Hobart has been engaged in the business of manufacturing and selling dishwashers, food machines, and scales for many years, has never manufactured or sold any type of refrigeration equipment, or any other products in competition with those of plaintiff.

Defendant (Ohio) Koch was formed as a corporation under the laws of the State of Ohio on March 26, 1969, and from that date to the present has been a wholly-owned subsidiary of defendant Hobart.

Defendant (Ohio) Koch entered an Agreement dated March 31, 1969, relating to the purchase of certain assets and the assumption of certain liabilities of a Missouri corporation, Koch Refrigerators, Inc. (Missouri). Specifically, the Agreement provided that defendant (Ohio) Koch would assume all liabilities on (Missouri) Koch's December 31, 1968 balance sheet (with the exception of Federal Income Taxes) and all unpaid liabilities of (Missouri) Koch incurred in the ordinary course of business, or consented to by defendant (Ohio) Koch, from January 1, 1969, to the closing date of the transaction underlying the Agreement, with the exception of any liabilities arising from claims for damages based upon alleged violations of any federal, state or local law. The transaction was closed on May 1, 1969. Liabilities for damages based on alleged violations of the federal antitrust laws, such as those asserted by plaintiff in its complaint herein, were excepted from the liabilities assumed by (Ohio) Koch, and were not assumed by it.

Prior to May 1, 1969, (Missouri) Koch had been engaged in the business of manufacturing and selling refrigeration equipment, but had never sold or attempted to sell such refrigeration equipment or any other products in competition with those of plaintiff.

The purchase was made at arm's length and for adequate consideration.

Elliott-Williams Company is a corporation with its principal office in Indianapolis, Indiana. Elliott-Williams manufactures coolers and refrigeration equipment and does business within this federal judicial district.

Traulsen & Co., Inc., is a corporation with its principal offices in College Point, New York. It is engaged in the manufacture and sale of refrigeration equipment and other products for food service establishments.

Victory Metal Manufacturing Co. (Inc.) is a corporation with its principal offices in Plymouth Meeting, Pennsylvania. It engages in the manufacture and sale of refrigeration and other equipment for food service establishments.

National Restaurant Association is a national association of restaurant operators. It has members and conducts business in

this federal judicial district. Its principal office is in Chicago, Illinois.

Charles A. Farish has his principal office in Ann Arbor, Michigan. He is Executive Director of NSF, was Secretary of its Council of Public Health Consultants, Director of NSFTL, and a member of the Executive Committee of both NSF and NSFTL.

Henry F. Vaughan is a former President and presently President Emeritus of NSF, a member emeritus of NSF Trustees, one of the incorporators of NSF, and Vice President of NSFTL. His principal office was in Ann Arbor, Michigan.

Robert M. Brown has his principal office in Ann Arbor, Michigan. He is President of NSF and NSFTL and a member of the Board of Trustees of NSF.

Thomas S. Gable has his principal office in Ann Arbor, Michigan. He was Assistant Executive Director of NSF and NSFTL and Director of Standards Development and Implementation of NSF.

Blucher A. Poole was a paid and retained consultant of NSF and formerly Chairman of NSF's Council of Public Health Consultants. He was until January, 1971, Assistant Commissioner, State Board of Health, State of Indiana, Indianapolis, Indiana.

John E. Vogt resides in Lansing, Michigan, and is Director, Division of Engineering, State Department of Health, State of Michigan, Lansing, Michigan. He is also a member of NSF's Council of Public Health Consultants.

Joel C. Beall resides in Macon, Georgia. He is Director, Environmental Health, Macon-Bibb County Health Department, Macon, Georgia. He was also Vice Chairman of NSF's Council of Public Health Consultants.

Harvey J. McPhee resides in St. Louis Park, Minnesota. He is Public Health Sanitarian, St. Louis Park Health Department and formerly Chairman of Food Equipment Standards Committee in National Association of Sanitarians.

This case has involved thousands of pages of record and hundreds of exhibits. Because court time must be devoted largely to the trial of criminal cases, special procedures were devised in this case to permit the full development of a record and its presentation to the court without the necessity of using actual court time for oral testimony. The court proposed and the parties agreed that the procedure outlined below should be utilized to hear this case:

1. The liability issue was separated for trial.

2. Plaintiff's counsel was directed to submit to defendants' counsel, on or before a specific date, its proposed stipulation of facts and its designation of those portions of the depositions, answers to plaintiff's interrogatories, admissions by any defendant, documents, and other tangible evidence upon which it proposes to rely.

3. On or before a specific date (about 30 days later), defendants' counsel was required to advise plaintiff's counsel in writing of their objections to the plaintiff's proposed stipulations of fact and designated evidence. Simultaneously, defendants were to submit to plaintiff's counsel their proposed stipulations of fact and their designation of those portions of the depositions, answers to defendants' interrogatories, admissions by the plaintiff, documents, and other tangible evidence upon which they propose to rely.

4. On or before a specific date (approximately 30 days later), plaintiff's counsel was to advise the defendants' counsel in writing of his objections to the defendants' proposed stipulations of fact and designated evidence.

5. On or before a specific date (15 days later), counsel for all parties were directed to meet to resolve their differences with reference to the stipulations of facts and the proposed evidence to be considered by the court.

6. On or before a specific date (approximately 30 days later), the parties were directed to present to the court for judicial resolution those objections

to proposed findings and evidence that could not be resolved otherwise.

7. On a date set by the court following the conclusion of the proceedings identifying the record, the parties were required to submit in open court an original and two copies of the agreed stipulations of fact, admissions, answers to interrogatories, designations of testimony and exhibits as to which no objections were made by any party; and admissions, answers to interrogatories, designations of testimony and exhibits as to which objections had been made, but were overruled by the court. The parties were also directed to submit a trial memorandum to the court at that time.

8. After the record was submitted to the court, the parties were to be permitted to appear in open court to summarize orally any part of the evidence to which they wished the court to direct its attention. They were also allowed to comment upon the opposing party's summary of evidence.

9. Thirty days following the oral hearing on the evidence, the plaintiff was to be required to file a brief in support of its claims on the liability issue and proposed findings of fact and conclusions of law. Fifteen days following the receipt of the plaintiff's brief, defendant was required to file a brief and proposed findings of fact and conclusions of law.

At a conference of all parties and the court, the court believed agreement had been reached to the effect that oral argument and oral summary of evidence was to be dispensed with, unless the court felt a need for it after examining the briefs and arguments and the proposed findings filed by each party containing references to the documents and depositions made available to the court. The court also thought the parties at that time agreed that it should proceed to study the record, proposed findings and briefs and to decide the case and make findings and conclusions of law. As a result of this belief that there was an agreement among the parties, the court filed findings of fact and conclusions of law on January 7, 1977.

Thereafter, the plaintiff filed a motion to vacate and set aside the judgment, a motion for new trial and for amendment of judgment and a motion to amend and supplement findings of fact and conclusions of law indicating that plaintiff did not believe there had been an agreement to waive oral summary of evidence.

After examining the motions and responses, it was agreed that a full hearing should be had of the nature called for in the original agreement to permit the parties to summarize the evidence they specifically wanted to call to the court's attention. It was suggested that the parties consider the court's findings filed on January 7, 1977, as the court's proposed or tentative findings, and that the hearing should include a discussion of the correctness of these findings, as well as any other findings the parties might suggest.

The court spent three days listening to the parties summarize the evidence and argue the law. It was helped by the diligence of plaintiff's attorney in preparing 5 volumes of excerpts from the deposition evidence and the many exhibits arranged around the court's proposed findings. In each case, the court's proposed finding was set out, the relevant proposals from each of the parties and the evidence he believed to have a bearing on the subject. This help made the presentation smooth and interesting.

Thereafter, the court has again examined the briefs and proposed findings, the stipulations and the documents submitted to it. Although this case obviously has been very time-consuming for the litigants and for the court, the in-court hearing time was held to a minimum. This procedure has enabled the court to resolve this case while observing the requirements of the Speedy Trial Act in criminal cases.

As a final result the court makes the following findings and conclusions of law. These findings are based on the court's

proposed findings filed January 7, 1977. About one-third of them have been modified, some in major respects.

## FINDINGS

1. The concept of establishing an organization to perform the same function for the food service industry with respect to sanitation that Underwriters Laboratory performs with respect to electrical safety originated as a result of discussions between Walter F. Snyder of the Toledo Health Department, defendant Henry Vaughan, then with the Detroit Public Health Service, and others at a meeting of the American Public Health Association in 1940. Discussions between these individuals and others ensued, culminating in a meeting in 1943 among representatives of defendant Hobart, Owens-Illinois, and Walter F. Snyder to explore the feasibility of establishing such an organization.

2. As a result of the foregoing discussions, the concept referred to above was expanded and implemented by the incorporation in 1944 of NSF, chartered for the purpose of promoting improvements in environmental sanitation and health.

3. The original incorporators of NSF were defendant Henry Vaughan, Dean of the School of Public Health, University of Michigan; Dr. Nathan Sinai, Professor of Public Health, University of Michigan; and Walter F. Snyder, Department of Public Health, Toledo, Ohio.

4. In addition to those persons identified above, the remainder of the original Board of Trustees were William Klare, of the Statler Foundation, and Judge Arthur J. Lacey.

5. The Foundation was originally operated by a board of five trustees: three from the field of public health and two from the general public. The work of NSF was to be directed by three officers and two standing committees.

6. A major factor leading to the formation of NSF was the existence of conflicting requirements in thousands of local public health codes. To the extent that various jurisdictions maintained varying standards, products had to be manufactured differently for different jurisdictions.

7. After a clinic in 1948, planned and convened by NSF, which was attended by about 400 public health personnel and interested industrialists, and after receiving the concurrence of the Surgeon General of the United States, the American Public Health Association, and other public health organizations, NSF decided to promulgate standards for equipment which would protect the public health. The Clinic urged the National Sanitation Foundation to:

   a. Undertake new and expanded research in the field of food sanitation.

   b. Provide the medium for the discussion, interpretation and the acceptance by public health and industry of the results of research.

   c. Distribute the results of accepted research to public health agencies and industry throughout the country.

   d. Serve as a medium through which local areas may standardize their interpretation of uniform codes.

   e. Develop an adequate, testing laboratory to which industry may send equipment and products for tests of sanitation qualities, on the assumption that health departments will accept the evidence of approval or rejection by the testing laboratory.

8. The U. S. Public Health Service encouraged NSF to develop standards in a manner similar to Underwriters Laboratories in order to promote public health in the United States; and it was contemplated that the NSF program would follow, and it in fact has followed, the Underwriters Laboratories' pattern.

9. NSFTL engages in research and testing of products to determine compliance with NSF standards and criteria, and issues seals and lists identifying products which comply with NSF standards and criteria.

10. In determining whether equipment complies with NSF standards, NSF has a stated policy that it will accept equipment evaluation and approval by any recognized

and qualified laboratory (e. g., universities, foundations, etc.) if based upon NSF standards and criteria. There is no evidence in the record that indicates that it has deviated from this policy, although the publications of NSF often fail to mention the existence of this policy in connection with the description of procedures to be followed to obtain an evaluation and approval of equipment. Most descriptions of procedures to be followed indicate that equipment must be examined by the National Sanitation Foundation Testing Laboratory, although it is clear that outside laboratories are sometimes used.

11. Two devices are used by NSFTL to accomplish its purposes: the official "Listing" published by NSFTL showing the names and addresses of the manufacturers who have been found to comply with NSF standards and the NSF seal of approval which is a copyrighted device signifying compliance with NSF standards. The use of the seal to identify products that comply with NSF standards and criteria resulted from discussions by NSF with public health authorities, including the Conference of Municipal Engineers. The official "Listing" publication is sent by NSFTL to state and local health and sanitation officials throughout the United States and to trade associations, purchasing agents, architects and food equipment consultants.

12. NSF standards and its seal have received the sanction, and support of the United States Public Health Service, which advised NSF that it would: (a) work with NSF in the development of standards; (b) consider equipment designed and constructed in accordance with NSF standards to be in compliance with Public Health Service-recommended ordinances and codes; (c) utilize equipment evaluations and special studies made by NSF; (d) consider as *prima facie* evidence of compliance with Public Health Service ordinances and codes, the NSF seal of approval and certification listing; (e) bring to the attention of NSF instances in which equipment bearing the NSF seal does not meet NSF standards; and (f) encourage state and local health authorities to communicate with NSF about matters involving NSF standards and criteria.

13. The NSF program has been endorsed by the American Public Health Association, the State and Territorial Health Officers Association, the National Association of Sanitarians and state and local health agencies.

14. NSF standards, its seal, and its listings are utilized in different ways by many, but not all, public health agencies throughout the United States. In Michigan, the seal is required on plastic pipe used for potable water, but is not required for food service equipment. Architects, in writing specifications for California state projects, specify the use of the seal, while Los Angeles regulations require that equipment meet NSF standards or equivalent, but do not require the seal. No state or local law of Georgia requires the seal, and equipment may be approved even if it doesn't meet NSF standards. In Indiana, the state recommends that municipal agencies utilize the standards, but except as to plastic pipe for potable water, use of the standards is not mandatory. The city of St. Louis Park, Minnesota, requires that NSF standards be met, but the seal is not required. Public health agencies and officials, including those who have participated in the formulation of the NSF standards as consultants, have made their own unilateral decisions as to what, if any, aspects of the NSF standards program will be adopted in their jurisdictions, and those decisions have not been uniform. Many states and local governmental units by law or policy utilize the NSF standards as a minimum standard. Some states have higher standards. No state by law or policy requires the seal, although some local governmental units require the seal or a showing of equivalency.

15. Neither NSF nor NSFTL writes standards, but they do provide the mechanism through which users, public health officials, and industry may meet to develop standards for various types of equipment and devices which could adversely affect public health. NSF encourages public

health officials and industry representatives to develop standards for equipment and devices which could adversely affect public health.

16. Most requests for NSF standards come from public health organizations; some come from the Council of Public Health Consultants; and some come from industry.

17. NSF Standard No. 7 provides sanitation requirements for new commercial refrigerators and food storage freezers used in food service establishments. That standard applies to reach-in refrigerators, reach-in frozen food cabinets, under-counter refrigerators, under-counter frozen food storage cabinets, refrigerated beverage coolers, and open-and-close refrigerators, as well as walk-in coolers and freezers to the extent that they are used in some large food service establishments. Where the standard describes parts and construction, it does so in terms of the qualities or conditions to be achieved: non-toxicity, smoothness, access for purposes of cleaning, and so on. The standard makes clear that substitutions and improved designs will comply:

"1.01 MINIMUM REQUIREMENTS: These are minimum requirements and variations may be accepted when they tend to make units more resistant to wear, corrosion, or more easily cleanable . . . . .

"1.02 ALTERNATE MATERIALS: Wherever specific materials are mentioned, it is understood that the use of materials equally satisfactory from the standpoint of sanitation and durability will be acceptable."

18. After discussion among a number of industry representatives about the need for standards in the field of commercial refrigeration and freezers, the first draft of Standard 7 was screened by many public health professionals before it was submitted to industry members on March 26, 1958.

19. There was a subsequent meeting on May 7, 1958, attended by NSF and some manufacturers, at which NSF outlined its proposed new standard for commercial reach-in refrigerators.

20. Thereafter, on July 23, 1958, NSF formed an Industry Advisory Committee and a Special Public Health Committee for the purpose of formulating a standard that would satisfy minimum public health requirements for commercial refrigerators for use in food service establishments.

21. The members of the Special Public Health Committee for the development of Standard No. 7 were:

Chairman, M. S. Hilbert, Wayne County Dept. of Health, Eloise, Michigan

M. B. Crabill, Omaha-Douglas County Health Dept., Omaha, Nebraska

E. Ludwig, New York City Dept. of Health, New York, New York

A. F. Parrish, State Dept. of Public Health, Atlanta, Georgia

R. L. Tarbett, State Dept. of Public Health, Berkeley, California

T. E. Sullivan, State of Indiana Board of Health, Indianapolis, Indiana

J. W. Smith, State Department of Health, Richmond, Virginia

22. The companies represented on the Industry Advisory Committee in the development of Standard No. 7 were:

| | |
|---|---|
| Traulsen & Co., Inc. Flushing, New York | H. Traulsen (Chairman) |
| Foster Refrigeration Corp. Hudson, New York | W. Whalen |
| Glenco Refrigeration Corp. Philadelphia, Pennsylvania | J. P. Heilweil |
| Herrick Refrigerator Co. Waterloo, Iowa | E. N. Northey, Jr. |
| Jewett Refrigeration, Inc. Buffalo, New York | H. Ruslander |
| McCall Refrigerator Corp. Hudson, New York | W. T. McCall |
| Silver Refrigeration Mfg. Corp. Brooklyn, New York | M. Silver |
| Victory Metals Mfg. Corp. Plymouth Meeting, Pa. | A. Raymond |
| Chrysler & Koppin Company Detroit, Michigan | R. H. Koppin |
| Elliott-Williams Co., Inc. Indianapolis, Indiana | J. H. Elliott |

23. After exchanging numerous drafts and after joint discussions, the members of the Industry Advisory Committee and the Special Public Health Committee submitted a mutually agreeable standard to the Joint

Committee on Food Equipment for its evaluation and recommendation.

24. The permanent members of the Joint Committee on Food Equipment at the time were:

| | |
|---|---|
| Chairman: C. L. Senn | Sanitation Director Los Angeles City Health Department |
| William Bower | Supervisory Sanitarian Oregon State Board of Health |
| Alfred H. Fletcher | Director, Div. of Environmental Health State Department of Health Trenton, New Jersey |
| William C. Miller, Jr. | Milk & Food Programs |
| John H. Fritz | Division of Sanitary Engineering Services Dept. of Health, Education and Welfare |
| Morton I. Hilbert | Director, Bureau of Engineering Wayne County Health Dept. Eloise, Michigan |
| Ray B. Watts | Ohio State Health Dept. |
| Lt. Col. Robert G. McCall | Preventive Medicine Div. Office of the Surgeon General Department of the Army |
| Lt. Comdr. H. W. LeBleau | Bureau of Medicine and Surgery Surgeon General's Office Department of the Navy |
| Karl K. Jones | State Board of Health Indianapolis, Indiana |
| Capt. J. D. L. Grant | Director, Public Health Food and Equipment Research Dept. National Restaurant Assn. |
| Lt. Col. Cardis W. Bryan | Office of the Director of Professional Services Office of the Surgeon General Department of the Air Force |
| Lt. Col. V. Harry Adrounie | U. S. Air Force Medical Service |
| Cmdr. R. T. Goerner, Jr. | Surgeon General's Office U. S. Navy |
| Charles A. Farnish | Secretary NSFTL |

For the purpose of approving a standard, this permanent membership is augmented by the Industry Advisory Committee who participated in the development of the standard.

25. In April, 1960, the Joint Committee on Food Equipment recommended Standard No. 7 to the Council of Public Health Consultants for adoption.

26. The Council of Public Health Consultants was and is a committee which operates, without remuneration, under the aegis of NSF. A spokesman for the Secretary of Health, Education and Welfare has characterized this Council as follows: "The NSF does indeed retain a council of public health consultants which represents the nation's outstanding scientists and engineers in the field of sanitation. The consultants represent state and local health departments, universities, and do not include industry representatives . . . No consultant stands to gain or lose by recommending approval or disapproval of NSF standards. We believe that all citizens gain by [Department of Health, Education and Welfare] participation in providing standardized equipment for sanitary handling of foods." Initially selected by NSF, and thereafter independently selecting their own replacements, the members of the Council of Public Health Consultants at the time it adopted Standard No. 7 on June 22, 1960, were:

R. Eliassen, Massachusetts Institute of Technology, Cambridge, Massachusetts

A. H. Fletcher, State Department of Health, Trenton, New Jersey

H. H. Hasson, W. K. Kellogg Foundation, Battle Creek, Michigan

H. G. Hanson, U. S. Public Health Service, Cincinnati, Ohio

M. S. Hilbert, Wayne County Health Department, Eloise, Michigan

C. W. Klassen, State Department of Public Health, Springfield, Illinois

F. Koriff, City Health Dept., Baltimore, Maryland

D. Lee, Florida State Board of Health, Jacksonville, Florida

J. Logan, Northwestern University, Evanston, Illinois

W. L. Mallmann, Michigan State University, East Lansing, Michigan

W. S. Mangold, University of California, Berkeley, California

S. Milliken, Public Health Federation of Greater Cincinnati Area, Cincinnati, Ohio

B. A. Poole, State Board of Health, Indianapolis, Indiana

J. D. Porterfield, M.D., Dept. of Health, Health Service, Washington, D. C.

C. Senn, Department of Health, Los Angeles, California

W. F. Snyder, National Sanitation Foundation, Ann Arbor, Michigan

J. Trichter, Dept. of Health, New York, New York

H. A. Whittaker, National Academy of Sciences, Washington, D. C.

27. Members of the Council of Public Health Consultants review drafts of proposed standards with members of their staffs who are experts in the area to be covered. The Council's function is to review the proposed standard to determine if it encompasses minimum health requirements for the particular equipment. It may not modify standards but must either approve or send them back for further review.

28. Following adoption by the Council of Public Health Consultants, the NSF Board of Trustees approved Standard No. 7. At that time the members of the Board of Trustees were:

Leroy E. Burney, formerly Surgeon General of the U.S.

Harvey J. Campbell, Executive Vice President, Detroit Edison Company

Walker L. Cisler, Chairman of the Board, Detroit Edison Company

Simon Den Uyl, Chairman of the Board, Bohn Aluminum and Gears Corporation

William G. Frederick, Professor, Department of Occupational and Environmental Health, Wayne State University

K. T. Keller, President, Chrysler Corporation

William Klare, Vice President, Statler Corporation

Judge Arthur J. Lacey

Joseph G. Molner, M.D., Commissioner of Health, Detroit

Leonard A. Scheele, formerly Surgeon General of the U.S.

J. Thomas Smith, Chairman of the Board, Dura Corporation

Walter F. Snyder, Executive Director, NSF

A. M. Turner, Vice President, Owens-Illinois, Inc.

Henry F. Vaughan, President Emeritus NSF, Dean Emeritus University of Michigan School of Public Health

The Board of Trustees has no responsibilities in the area of research or writing standards. It relies on the Council of Public Health Consultants to advise it on the public health aspects of the standards.

29. Standard No. 7 became effective in November, 1960.

30. NSF standards, including No. 7, are reviewed every three years. From time to time Standard No. 7 has been amended.

31. To cover the cost of equipment testing and plant inspection, NSFTL assesses its users an annual fee of $350. If a manufacturer elects to have its approved product listed under more than one name or under more than one standard, there is an additional charge of $200 and $100, respectively. If more than one plant must be inspected, there is an additional charge of $300 per plant. If the manufacturer has not participated in the formulation of the standard, there is a $750 one-time charge, used to defray the cost of updating and republishing the standard.

32. Plaintiff's net sales and after-tax profit for the years 1959 through 1970, inclusive, were as follows:

| Year | Net Sales | After-Tax Profit |
|------|-----------|------------------|
| 1959 | $ 601,463 | $ 23,634 |
| 1960 | 771,045 | 53,483 |
| 1961 | 773,794 | 49,826 |
| 1962 | 562,817 | 6,174 |
| 1963 | 603,339 | 7,030 |
| 1964 | 684,406 | 41,006 |
| 1965 | 1,055,550 | 110,206 |
| 1966 | 1,402,640 | 166,725 |
| 1967 | 1,706,466 | 217,942 |
| 1968 | 1,924,286 | 201,045 |
| 1969 | 2,058,953 | 132,075 |
| 1970 | 2,533,840 | 174,793 |

33. Plaintiff has manufactured walk-in coolers and freezers since 1953. In 1963, plaintiff entered the door business, and in 1964 began selling racks and other accessories. Plaintiff's net sales of coolers and freezers for 1959 through 1970, inclusive, were as follows:

**1072**

| Year | Walk-In Coolers and Freezers Net Sales |
|------|------|
| 1959 | $601,462.89 |
| 1960 | 771,045.15 |
| 1961 | 773,793.66 |
| 1962 | 562,817.40 |
| 1963 | 502,402.87 |
| 1964 | 317,754.26 |
| 1965 | 391,356.64 |
| 1966 | 486,376.82 |
| 1967 | 558,363.20 |
| 1968 | 530,064.83 |
| 1969 | 576,502.00 |
| 1970 | 844,988.55 |

34. With two exceptions, all of plaintiff's sales of "walk-ins" have been to food markets, rather than food service establishments.

35. Some manufacturers (their identities varying with the equipment involved and including many not defendants in this action or even competing in the same product lines in which plaintiff is engaged) have participated in the initial formulation of standards criteria.

36. Some equipment manufacturers (but not all of those named as defendants in this action), have contributed financial support to NSF over and above its testing and inspection fees. Over the years since NSF was started, it has asked for and received substantial contributions from those industries and trade groups which are commercially interested in the NSF program. During this same period of time many of these same companies have paid substantial sums to NSFTL for its evaluation and certification program.

37. Neither plaintiff's competitors nor any other manufacturers have participated in the review and deliberation of the Council of Public Health Consultants or have voted to adopt standards. Rather, it is the uncontradicted fact that this function is performed solely by non-manufacturing consultants who have no commercial interest and no personal monetary stake in the standards or their effect upon the participating manufacturers.

38. Plaintiff knows of no instances, and the record is barren of any, in which defendants, NSF, National Restaurant Association, or any manufacturing defendant induced any public health agency to apply Standard No. 7 to food markets. Although NSF makes it clear that Standard No. 7 was not written to cover food markets, the policy of NSF is as follows:

"We feel that the actual application of the Standards to local requirements is a decision of local jurisdiction and that where any department feels a Standard can be helpful in upgrading their general sanitation program, they should certainly feel free to use them to fullest advantage."

39. Each manufacturer participating in the development of Standard No. 7 had to comply with its provisions before it could display the seal and be listed.

40. There is no evidence that any manufacturer of coolers represented to any purchaser or potential purchaser of coolers that NSF standards apply to food markets. NSF representatives have publicly stated and have advised public health officials that Standard No. 7 was drafted to apply only to public eating and drinking establishments. Plaintiff acknowledges it has no evidence of NRA action to encourage application of NSF Standard No. 7 other than to food service establishments.

41. NSF recommends that regulatory agencies use NSF standards as a standard for acceptance of equipment and devices covered by the standards.

42. NSF has recommended that states should not require the NSFTL seal as a matter of law. NSF does promote the seal as a *prima facie* indicium of compliance with the relevant NSF standard, although early in the program in the 1950's and 1960's there is evidence that NSF and its employees urged that regulatory agencies require the use of the seal. This has not been true recently, in the past ten years. There is no evidence that any other defendant promoted or sought the adoption by public health agencies and officers of the NSF approval listing or seal as a requirement for approval.

43. NSF has promoted the adoption by public health agencies and officers of its standards and the use of its listing or seals as useful evidence of *prima facie* compliance with those standards. An example of NSF policy in connection with promotion of NSF standards is shown by their suggestion for regulatory language:

"SUGGESTIONS CONCERNING REGULATIONS GOVERNING THE SANITATION OF COMMERCIAL POWERED FOOD PREPARATION EQUIPMENT"

"It is strongly recommended that NSF Standards, representing a cross-section of opinion of workers in the field of environmental health, be accepted and followed by enforcement officials. However, their incorporation in detail into local sanitary codes does not appear to be necessary and is likely to be cumbersome.

"In municipalities, counties, and health districts in which the adoption of legislation by reference is considered legal, the following regulation should serve to implement the use of this Standard for Commercial Powered Food Preparation Equipment:

"ALL COMMERCIAL POWERED FOOD PREPARATION EQUIPMENT INSTALLED ON OR AFTER _____ IN FOOD SERVICE ESTABLISHMENTS IN THIS JURISDICTION SHALL MEET THE NATIONAL SANITATION FOUNDATION STANDARDS FOR SUCH EQUIPMENT.

"or, if considered desirable, it will be simpler to adopt the following more general regulation applying to all NSF Standards in the food service field:

"ALL EQUIPMENT INSTALLED ON OR AFTER _____ FOR USE IN THE PREPARATION OF FOOD IN PUBLIC FOOD SERVICE ESTABLISHMENTS IN THIS JURISDICTION SHALL MEET NATIONAL SANITATION FOUNDATION STANDARDS.

"In fact, the adoption of this broad regulation will save time as well as advertising and printing costs as, no doubt, many different standards will be adopted. Otherwise, each standard will require the adoption of a specific regulation.

"Wherever the legality of adopting legislation by reference is not recognized, delete the portion of either of the above regulations after the word 'SHALL' and substitute therefor the words 'BE OF A TYPE APPROVED BY THE HEALTH OFFICER'. The health officer may be guided by the National Sanitation Foundation Standards in his approval of types."

44. The record demonstrates that NSF has furnished its services to interested manufacturers, users, and public health officials and consultants for evaluation and possible promulgation of standards proposed and formulated by them.

45. The record is devoid of evidence from which any inference can be drawn that any NSF employee or consultant, whether or not a public health official, has been corrupted, bribed, or otherwise influenced improperly in formulating and adopting NSF standards, in promoting the adoption of NSF standards by public health authorities, or in testing and inspecting equipment to determine compliance with NSF standards.

46. There is no evidence that any defendant told any customer or potential customer that any of plaintiff's products failed to satisfy the requirements of any NSF standard.

47. There is no evidence in the record that any defendant urged exclusion by customers or others of plaintiff's products because they do not bear the seal or are not in the listing publication.

48. Prior to this action, defendant manufacturers, Victory Metal, Traulsen, Hobart and Koch had never heard of Eliason; had never confronted Eliason products in the market place; had never made walk-in coolers or freezers; and had never sold refrigeration products to food markets.

49. There is no evidence or any record basis for an inference that any public health agency or official acted other than honestly

and in good faith in the exercise of official authority and discretion in adopting or resorting to, wholly or in part, NSF standards, approval listings, or seals.

50. There is no evidence that the standards are in any way unreasonable or arbitrary in their content or discriminatory in their application, or that their objectives are illegitimate or undesirable.

51. There is no evidence and plaintiff does not complain that its products have been denied testing, approval listing, or the NSF seal, or that it has been treated by NSF differently than its competitors or other manufacturers.

52. There is no evidence that the fees charged by NSFTL for testing equipment and inspecting production facilities are unreasonable in relation to the cost of such services, or that such fees impose an economic burden on manufacturers choosing to use the NSFTL approval listing or seal.

53. The record does not support plaintiff's position that private architects have been induced by NSF to require compliance with NSF standards, listings, or seals, although early in the program NSF employees made a systematic effort to contact architects and spread the word about NSF standards and its seal of approval. The evidence indicates that the NSF standards actually come from the various health departments to the architects, as would many code requirements. The evidence does not show that any customer has required compliance with standards, seal, or approval listing other than in response to public health authority regulations.

54. Plaintiff has sold its products in jurisdictions which as a matter of law required compliance with NSF standards or the NSFTL seal.

55. A few public agencies and officials have required NSFTL approval and listing, but the record fails to show that any significant number of public agencies or officials have adopted any absolute requirement that equipment like that of the plaintiff must have the NSFTL approval listing or seal. Moreover, with at most a single ex-

ception, the record shows that even in those few instances where any seal or listing requirement had been adopted, agencies have authorized installation of such equipment after testing it for compliance with their sanitary requirements. NSF has engaged in an advertising campaign in, among others, the Wall Street Journal and the Reader's Digest, as well as in trade journals and brochures, to promote acceptance of its seal of approval to indicate that the product on which the seal appears complies with NSF standards and to suggest that it is sanitary and safe. The expressed intention of the advertising program was to support products that have the NSF seal.

56. In August, 1962, plaintiff submitted an application to NSFTL for the testing of its walk-in coolers under Standard No. 7, but later withdrew its application and, upon request, had its money ($1,250) refunded.

57. With reference to its August, 1962 application, plaintiff rejected NSF; NSF did not reject Eliason.

58. On April 14, 1971, a meeting was held of prospective industry sponsors of a food market standard. Plaintiff was invited to attend and did send representatives who tape-recorded the session.

59. Plaintiff elected not to attend any other meetings of a committee established to formulate a food market standard, although it was free to do so.

60. There is not, at this date, a standard for food markets (NSF or otherwise) even though four to six public health agencies, without urging or approval by NSF or any other defendant, require food market coolers and freezers used in their jurisdictions to meet Standard No. 7 requirements. Manufacturing defendants, e. g., the Tyler Division of Clark, oppose the application of Standard No. 7 to food stores; and the equipment they sell to such customers does not comply with the standard or bear the NSF seal.

61. Plaintiff has sought the assistance of the Federal Trade Commission and the Department of Justice in its fight against NSF. After an 11-month investigation in

1969, the FTC advised plaintiff: "On the basis of information developed in that investigation, we see no evidence that the standards employed by the Foundation are discriminatory or otherwise unfair within the meaning of the Federal Trade Commission Act or any of the other statutes administered by the Commission." The Antitrust Division of the Department of Justice, after asking for "substantial evidence" and advising that "you should bear in mind that the promotion of the adoption of a requirement by public agencies that particular products bear a seal of approval by a private, scientific association is not, without more, unlawful under the antitrust laws," ultimately advised plaintiff that: "On the basis of our review of these documents and of previous communications from Mr. Eliason, we have concluded that further investigation and/or action by the Department of Justice under the federal antitrust laws would not be warranted at this time."

62. Relying upon the personal political and economic philosophy of its principal, plaintiff opposes *all* standards promulgated wholly or in part by private entities and, particularly, any privately conducted testing procedure for compliance which results in a seal or approved listing even though the cost of such testing is reasonable.

63. There is no evidence in the record that either defendant, Hobart, or defendant, (Ohio) Koch, or (Missouri) Koch, participated in the *promulgation* of NSF Standard No. 7; nevertheless, it is clear that (Missouri) Koch did participate in the development of Standard No. 7 before its president became angry at those involved in developing the standard. It is also clear that (Missouri) Koch later became an industry participant in the NSF Standard No. 7 program. The record also indicates that (Ohio) Koch is an industry participant in the Standard No. 7 program. Defendant, Hobart, although not a direct participant in the Standard No. 7 program, was one of the original industry supporters of NSF and an active participant in the total program of NSF and NSFTL.

## CONCLUSIONS OF LAW

1. This court has jurisdiction of the subject matter of this action.

2. This court has jurisdiction over plaintiff and each defendant except Joel C. Beall, Blucher A. Poole and Harvey J. McPhee; said defendants Beall, Poole and McPhee are hereby dismissed as defendants.

3. Venue of this action is proper in the Eastern District of Michigan.

4. To establish a conspiracy in violation of Section 1 of the Sherman Act, plaintiffs must establish that identified parties conspired to impose unreasonable restraints on interstate commerce. In order to sustain the conspiracy element of a Section 1 case, it is necessary for plaintiff to establish by facts in the record that two or more persons [including a defendant] combined to accomplish some unlawful purpose, or to accomplish a lawful purpose by unlawful means, and the kind of agreement or understanding which existed as to each defendant. The scope of each defendant's participation in this agreement, if any, must be determined individually from the evidence proved as to that defendant. To establish a conspiracy in unreasonable restraint of trade, plaintiffs must show either that any conspiracy that is proved falls within one of the categories of *per se* offenses (*e. g.*, price fixing, division of markets or customers, or group boycotts), or that any such conspiracy is unreasonable when tested by the rule of reason.

5. In order to establish a monopolization violation of Section 2 of the Sherman Act, plaintiff must establish the existence of a relevant product and geographic market; that defendants possessed monopoly power within that relevant market; and that such monopoly power was willfully acquired or maintained by such defendant.

6. In order to establish an attempt to monopolize in violation of Section 2 of the Sherman Act, plaintiff must establish the existence of a relevant product and geographic market; that defendants had the specific intent to acquire monopoly power within that relevant market; that

defendants took steps to achieve that purpose; and that defendants posed a dangerous probability of success in obtaining such monopoly power.

▮▮ 7. The facts of record fail to establish any violation of Section 1 of the Sherman Act:

(a) Plaintiff has failed to prove any group boycott in *per se* violation of the Sherman Act in that the record demonstrates that the NSF standards program was not established with, nor is it carried on with, any anti-competitive purpose to stifle competition or unreasonably exclude plaintiff or others from competing;

(b) Rather, the record demonstrates that the primary purpose behind the NSF standards program has been pro-competitive in attempting to promote uniform standards among public health jurisdictions, thereby minimizing the number of differing, even conflicting, requirements, reducing costs for all manufacturers, and increasing the number of manufacturers able to compete in each jurisdiction;

(c) There is no evidence in the record, nor is it charged, that there was price fixing, division of markets or division of customers.

(d) Measured by the rule-of-reason standard, the record fails to show any other violation of Section 1 of the Sherman Act, for the following reasons:

(1) The record fails to show that the content of any NSF standard, including Standard No. 7, is unreasonable, burdensome or arbitrary, and there is no showing that plaintiff's equipment fails to comply with any NSF standard by which it may be covered;

(2) The record establishes the reasonableness of the procedure for formulating NSF standards, including Standard No. 7, in that spokesmen for all interested parties—including any manufacturer who chooses to participate, users or customers, public health officials and sanitation experts—are offered the opportunity to and do present their views and contribute to the formulation of NSF standards, so that the interests of one group are not controlling and conflicts are resolved with the participation of all interested parties;

(3) The record establishes the reasonableness of the procedure for adoption of NSF standards, including Standard No. 7, in that NSF standards can be adopted only upon the vote of the Council of Public Health Consultants, which is comprised exclusively of public health officials who have no commercial or personal monetary interest in the standards or their effect upon any manufacturer;

(4) The record establishes that the NSF standards program, including Standard No. 7, is not unduly burdensome, in that satisfactory product performance is an alternative to meeting construction or design requirements, and in that the standards allow competitive innovations and adoption of more efficient and economical manufacturing processes. Standard No. 7 expressly provides that variations may be accepted and that whenever specific materials are mentioned, alternates may be substituted;

(5) There is no evidence in the record that the NSF standards program, including Standard No. 7, is arbitrary, discriminatory, or unduly burdensome, in that there is no evidence that the equipment of plaintiff or any other manufacturer has been refused testing, approval listing or the NSF seal on the same basis available to other manufacturers, and the fees charged for such services are not unreasonable in relation to the cost thereof and do not pose any practical or economic burden to plaintiff.

(e) No defendant has attempted to coerce plaintiff to comply with NSF standards;

(f) No defendant has urged users or other private parties to exclude plaintiff's products because such products lack the NSF seal or approval, or because such products fail to comply with any NSF standard;

(g) The burden imposed on plaintiff by widespread customer and other private party acceptance of the NSF standards and seal or approval listing, does not in itself establish any conspiracy in unreasonable restraint of trade. When a pri-

vately promulgated standard, including one which has not been adopted by governmental agencies as a legal requirement, is fair and reasonable both in its content and application, as is Standard No. 7, the impact resulting from private acceptance and exclusion of competing products not thus approved does not constitute an unreasonable restraint of trade, see *Structural Laminates, Inc. v. Douglas Fir Plywood Association*, 399 F.2d 155 (9th Cir. 1968), *cert. denied*, 393 U.S. 1024, 89 S.Ct. 636, 21 L.Ed.2d 569 (1969);

(h) The conduct of some defendants in soliciting and urging other governmental defendants to adopt NSF findings, listings and seal as binding in their jurisdictions is immunized by the Noerr-Pennington doctrine [*Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961); and *United Mine Workers of America v. Pennington*, 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965).] Any restraint flowing from the governmental adoption of such requirements is beyond Sherman Act challenge as state action under the doctrine of *Parker v. Brown*, 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1934). This principle is particularly true where, as here, there is no evidence that any governmental personnel, either in consulting with NSF or in adopting any NSF-promulgated requirements in their public health jurisdiction, have been corrupted, bribed or otherwise improperly influenced, and there is no showing that their adoption of such requirements was not a lawful exercise of their official authority and discretion.

8. The record fails to establish the offense of monopolization under Section 2 of the Sherman Act, in that:

(a) There is no evidence from which a relevant product and geographic market can be determined;

(b) The evidence does not support a conclusion that any defendants individually or collectively possessed monopoly power within any relevant market.

9. The record fails to establish the offense of an attempt or conspiracy to monopolize under Section 2 of the Sherman Act, in that:

(a) There is no evidence from which to determine the existence of a relevant product and geographic market;

(b) The evidence does not support a conclusion that any defendant had the specific intent to acquire monopoly power within a relevant market;

(c) The evidence does not support a conclusion that any steps were taken to achieve the objective of obtaining monopoly power;

(d) The evidence does not support a conclusion that defendants, individually and collectively, have posed a dangerous probability of success in obtaining monopoly power within a relevant market.

10. In summary, there are no facts in the record from which to conclude that any defendant has violated any provision of the Sherman Act.

11. Plaintiff's complaint must be and hereby is dismissed.

12. Judgment will be entered for the defendants, at plaintiff's costs.

So ordered.