**CONTINENTAL CABLEVISION OF OHIO, INC., et al.,
Plaintiffs-Appellants,**

v.

**AMERICAN ELECTRIC POWER COM-
PANY, et al., Defendants-Appellees.**

No. 81–3650.

Submitted on Briefs June 23, 1983.

Decided Sept. 2, 1983.

Gardner F. Gillespie, Jean Straudt Moore, Janet L. McDavid, Hogan & Hartson, Washington, D.C., for plaintiffs-appellants.

Howard P. Krisher, David Greer, Dayton, Ohio, Thomas P. Mulligan, James C. Davis, Eben Crawford, Cleveland, Ohio, Curtis E. McIntyre, Dayton, Ohio, Robert Jefferis, Dayton, Ohio, for defendants-appellees.

Before LIVELY and CONTIE, Circuit Judges, and PHILLIPS, Senior Circuit Judge.

PHILLIPS, Senior Circuit Judge.

Plaintiffs, several cable television (CATV) operators and an association of such operators in Ohio (Continental Cablevision), brought this antitrust action against American Electric Power Company (AEP) and its wholly owned subsidiary, Ohio Power Company, seeking treble damages and injunctive relief. Plaintiffs alleged that defendants conspired together and with other Ohio electric and telephone companies to fix rates for pole attachment rentals in violation of § 1 of the Sherman Act and abused their naturally acquired monopoly power by establishing and maintaining unreasonable rates in violation of § 2 of the Act. Defendants denied any liability and filed a counterclaim alleging a group boycott among several CATV companies in violation of § 1 of the Sherman Act and a pendent state-law counterclaim for pole attachment rentals due from those CATV companies that attached cables to Ohio Power's poles but refused to pay the increased rate.

Following an extensive trial, District Judge Robert M. Duncan entered a comprehensive opinion addressing each argument made on behalf of the parties. Judge Duncan concluded that plaintiffs failed to prove that defendants engaged in an unlawful price-fixing conspiracy or otherwise abused their monopoly power. With respect to defendants' counterclaim, the court held that the conduct of the CATV companies did not amount to a group boycott. In a separate Memorandum Order, Judge Duncan ruled that Ohio Power was entitled to recover on its pendent counterclaim for pole attachment rentals.

This appeal ensued with plaintiffs claiming that the district court erred as a matter of law in finding defendants did not violate §§ 1 & 2 of the Sherman Act in establishing and maintaining pole attachment rates. Pursuant to Rule 34(f) of the Federal Rules of Appellate Procedure the parties waived oral argument and the case was submitted on briefs. We affirm.

I.

A CATV system is a facility capable of receiving television and other broadcast signals from distant locations and distributing those signals to subscribers by means of an interconnected network of transmission cables. To provide its service, a CATV company must have a means of getting the cables into the homes of subscribers. Traditionally, CATV companies have used existing utility poles, owned by electric and telephone companies, as the distribution network for their cables. Although it is possible for a CATV company to place cables underground or construct its own set of poles, such alternatives are costly and impractical. Consequently, since electric and telephone companies often share their utility poles with each other, in any given locale there generally is only one set of utility poles and only one pole owner with which to negotiate.

Since 1951 defendants have permitted CATV operators to attach their cables to utility poles on a nondiscriminatory basis. As a condition, CATV operators are required to sign and abide by the terms and conditions of the standard CATV pole attachment agreement drafted by AEP's service company.[1] The terms of the standard

---

1. AEP is a public utility holding company which operates as an integrated electric public utility holding company system. *See* 15 U.S.C. § 79b(a)(7). AEP has no employees and is operated by its service company. The service company is a New York corporation charged with providing management, supervisory, accounting, engineering, purchasing and other services to seven operating companies which operate in seven states. The service company transmits its decisions to the operating companies for implementation. The operating companies are authorized to carry out routine local operations within guidelines established by the

agreement provide that CATV operators are to assume all out-of-pocket expenses attributable to the attachment of their equipment to defendants' poles. The agreement provides further that CATV companies are to pay an annual rental fee per pole. The establishment and maintenance of the attachment rate is the subject of the present litigation.

Prior to February 1965, defendants imposed an annual pole attachment rate of $2.00 per pole. Subsequently, the service company increased the rate to $4.00 per pole, per annum. Apparently, this increase was a result of AEP following the then prevailing attachment rate charged by several telephone companies. For approximately ten years, the $4.00 rate remained in effect. Thereafter, in 1975, defendants imposed the present annual rate of $5.60 per pole.

Plans for an increased attachment rate surfaced in 1974, when the AEP network began experiencing severe economic problems due mainly to the inability of the operating companies to secure timely electric rate increases. The service company assigned to Donald Ruff, operating manager of transmission and distribution, the task of formulating and recommending an appropriate rate increase.

In performing this task, Ruff attended a national trade association conference and conferred with representatives of other utility companies. In determining whether defendants' rates were within the "ballpark," Ruff discovered that cable attachment rates varied from $1.00 to $9.00 per contract, with some companies anticipating increases. In January 1975, Ruff attended a meeting held by the executive vice presidents from AEP's operating companies. At the meeting, Ruff recommended that a CATV attachment rate of $7.00–$7.20 be adopted. As noted by the district court, Ruff apparently arrived at this figure by using cost data obtained from various operating companies and an inflation factor. However,

the operating companies rejected Ruff's proposed rate and, in turn, opted for the present annual rate of $5.60 per pole. The operating companies found the $7.00 rate "too much" and that the $5.60 rate was a reasonable figure.

Subsequent to the establishment of the $5.60 rate, defendants and other utility companies frequently exchanged information relating to the rates, terms and conditions governing CATV pole attachments. Indeed, there is no dispute that defendant Ohio Power made available its current attachment rate and that other Ohio utilities were familiar with CATV agreements used by various utility companies. The information took various forms and was disseminated in a variety of ways, including telephone conversations, letters, surveys, questionnaires and discussions at national and regional trade association conventions. The information focused primarily on existing pole attachment rates and proposed increases. Sometimes the information was general in nature and at other times, quite specific. There is little doubt that the information was helpful to those utilities being approached by CATV operators seeking attachment agreements.

Perceiving the pole attachment rates as unreasonable, and unable to secure any justification for the increase, plaintiffs filed this antitrust action against AEP and Ohio Power. Plaintiffs contend that the exchange of rate information among defendants and other utilities amounted to a conspiracy to fix pole attachment rates in violation of § 1 of the Sherman Act. The CATV companies argue also that § 2 of the Act was violated by defendants abusing their naturally acquired monopoly power in imposing unreasonable pole attachment rates.

II.

Section 1 of the Sherman Act proscribes every contract, combination or con-

service company. Also, operating companies are without authority to modify, change or vary operating instructions or business policy received from the service company. Therefore, once the standard CATV pole attachment agreement has been drafted by the service company, the operating companies have no authority to change any of its terms without prior approval of the service company.

spiracy in restraint of trade or commerce. 15 U.S.C. § 1. To sustain a § 1 claim, plaintiffs must prove by a preponderance of the evidence two essential elements:

(1) That defendants entered into a contract, combination or conspiracy; and

(2) That such contract, combination or conspiracy amounted to an unreasonable restraint of trade or commerce among the several States.

See Smith v. Northern Michigan Hospitals, Inc., 703 F.2d 942, 949 (6th Cir.1983); Davis-Watkins Co. v. Service Merchandise, 686 F.2d 1190, 1195–96 (6th Cir.1982). In essence, plaintiffs must demonstrate that the alleged combination or conspiracy had either an unlawful purpose or an anticompetitive effect. See United States v. United States Gypsum Co., 438 U.S. 422, 436 n. 13, 98 S.Ct. 2864, 2873 n. 13, 57 L.Ed.2d 854 (1978).

### A.

The district court concluded that plaintiffs failed to prove the establishment of a conspiracy or combination among defendants and other utility companies to fix pole attachment rates. Additionally, the court held that the pole attachment rates were not designed for an unlawful purpose or anticompetitive effect. We hold that these conclusions are supported by the record.

Plaintiffs contend that the district court erred as a matter of law in holding that defendants did not fix prices in violation of § 1. The gravamen of plaintiffs' claim is that defendants and others exchanged information concerning pole attachment rates and that such frequent dissemination enabled defendants to coordinate and fix such rates. In substance, plaintiffs argue that the exchange of rate information constituted a per se violation of § 1. This claim is without merit.

In American Column & Lumber Co. v. United States, 257 U.S. 377, 411–12, 42 S.Ct. 114, 121, 66 L.Ed. 284 (1921) the Court stated that § 1 condemned the exchange of specific price information when the clear purpose was to stabilize prices. See also United States v. American Linseed Oil Co., 262 U.S. 371, 389–90, 43 S.Ct. 607, 611–12,

67 L.Ed. 1035 (1923). In Maple Flooring Mfrs. Assn. v. United States, 268 U.S. 563, 582–83, 586, 45 S.Ct. 578, 584–85, 586, 69 L.Ed. 1093 (1925), it was found that § 1 was not violated by the dissemination of cost data, notwithstanding an apparent stabilizing effect on price, where no intent to constrain individual competitive activity was established. See also Sugar Institute, Inc. v. United States, 297 U.S. 553, 598, 56 S.Ct. 629, 642, 80 L.Ed. 859 (1936); Cement Mfrs. Protective Assn. v. United States, 268 U.S. 588, 602–03, 606, 45 S.Ct. 586, 590–91, 592, 69 L.Ed. 1104 (1925). The Court's decision in United States v. Container Corp. of America, 393 U.S. 333, 89 S.Ct. 510, 21 L.Ed.2d 526 (1969), upon which plaintiffs rely heavily, raised doubts as to the practice of exchanging price information. In that case, the Court held that under the peculiar market conditions presented, the conclusion was irresistible that the exchange of price information caused a stabilization of prices and produced an anticompetitive effect in the corrugated container industry. 393 U.S. at 337, 89 S.Ct. at 512. Consequently, confusion arose as to whether the Container Corp. majority was announcing a per se rule banning all exchanges of price information. See 393 U.S. at 338 & n. 4, 89 S.Ct. at 513 & n. 4. But see 393 U.S. at 338–39, 89 S.Ct. at 513–14 (Fortas, J., concurring) (joining the judgment of the Court with the understanding that the exchange of price information is not a per se violation of the Sherman Act).

■ However, any confusion that may have been caused by Container Corp. was dispelled subsequently by the Court's explicit statement that "the dissemination of price information is not itself a per se violation of the Sherman Act." United States v. Citizens & Southern National Bank, 422 U.S. 86, 113, 95 S.Ct. 2099, 2115, 45 L.Ed.2d 41 (1975), citing Maple Flooring, supra; Cement Mfrs. Protective Assn., supra; and Container Corp. of America, supra. This position was reaffirmed in United States Gypsum Co., supra, 438 U.S. at 441 n. 16, 98 S.Ct. at 2875 n. 16 ("The exchange of price data and other information among competitors does not invariably have anticompeti-

tive effects; indeed such practices can in certain circumstances increase economic efficiency and render markets more, rather than less, competitive. For this reason, we have held that such exchanges of information do not constitute a *per se* violation of the Sherman Act."). Accordingly, in the absence of a purpose or effect to restrain competition, or some other evidence of an actual agreement to restrain competition, we hold that the exchange of price data does not offend § 1 of the Sherman Act.[2]

The undisputed facts in the present case demonstrate clearly that the exchange of rate information among defendants neither constituted an actual agreement to fix prices in restraint of trade nor resulted in a prohibited restraint of trade or commerce. Since the 1960s, Ohio Power has had only two pole attachment rate increases. The rates charged by Ohio Power were established by the service company. As the district court found, "[t]he rates, terms and conditions governing CATV attachments to the poles of the Operating Companies, including Ohio Power, have resulted from the unilateral and single act and decision of the Service Company." Therefore, from a practical standpoint, it would do the utility companies no good to conspire among themselves since the service company made the final determination as to the establishment and maintenance of pole rates. Accordingly, such independent, unilateral action is insufficient to sustain a § 1 offense. *See Davis-Watkins Co., supra,* 686 F.2d at 1196, citing *United States v. Colgate & Co.,* 250 U.S. 300, 307, 39 S.Ct. 465, 468, 63 L.Ed. 992 (1919). *See also Overseas Motors, Inc. v. Import Motors, Ltd., Inc.,* 375 F.Supp. 499, 531 (E.D.Mich.1974), *aff'd,* 519 F.2d 119 (6th Cir.), *cert. denied,* 423 U.S. 987, 96 S.Ct. 395, 46 L.Ed.2d 304 (1975).

It is important to note also that the district court's findings indicate that through various trade association meetings and surveys the utility companies sought rate information to serve merely as a touchstone for formulating new rates. We are re-

ferred to no authority which prohibits a company, in the absence of an unlawful purpose or anticompetitive result, from examining rates charged by similar companies in the industry and in the exercise of business judgment, considering such rates in the establishment of its own rate. *Cf. United States v. International Harvester Co.,* 274 U.S. 693, 708–09, 47 S.Ct. 748, 753–54, 71 L.Ed. 1302 (1927) ("[T]he fact that competitors may see proper, in the exercise of their own judgment, to follow the prices of another manufacturer, does not establish any suppression of competition or show any sinister domination.").

Plaintiffs failed to prove that defendants' exchange of price information "had a unity of purpose or a common design and understanding, or a meeting of minds in an unlawful arrangement." *American Tobacco Co. v. United States,* 328 U.S. 781, 810, 66 S.Ct. 1125, 1139, 90 L.Ed. 1575 (1946). Therefore, we agree with the district court that defendants' practice of exchanging price information was not for the unlawful purpose of establishing a price-fixing agreement.

B.

Since we conclude that defendants did not engage in any *per se* illegal activity, it leaves to be determined, under the rule of reason, whether such price exchanging practice had an unreasonable anticompetitive effect. *See United States Gypsum Co., supra,* 438 U.S. at 436 n. 13, 98 S.Ct. at 2873 n. 13; *Eliason Corp. v. National Sanitation Foundation,* 485 F.Supp. 1062, 1075 (E.D. Mich.1977), *aff'd,* 614 F.2d 126 (6th Cir.), *cert. denied,* 449 U.S. 826, 101 S.Ct. 89, 66 L.Ed.2d 29 (1980). We conclude that it did not.

The uncontested findings of the district court support the conclusion that the exchange of price information had no anticompetitive effect. The parties stipulated that no competition exists among them.

---

2. We do not read the Court's statement in *Great Atlantic & Pacific Tea Co. v. Federal Trade Comm.,* 440 U.S. 69, 80, 99 S.Ct. 925, 933, 59 L.Ed.2d 153 (1979) to compel an oppo-

site rule. It is clear under some product and market conditions the exchange of price information among competitors does violate the Sherman Act.

Moreover, there is no concrete evidence of any competition among defendants to be restrained. Since each operating company has a monopoly within its service area, defendants have no need to compete with other utilities for cable attachment rentals. "Competition is restrained only if either two or more competitors act concertedly, or one competitor erects barriers against competitive activity by another, or uses power at one level to restrict competition at another." L. Sullivan, ANTITRUST 328 (1977). *See also DuPont Glore .Forgan, Inc. v. American Telephone & Telegraph Co.,* 437 F.Supp. 1104, 1130 (S.D.N.Y.1977), *aff'd,* 578 F.2d 1367 (2d Cir.), *cert. denied,* 439 U.S. 970, 99 S.Ct. 465, 58 L.Ed.2d 431 (1978).

Plaintiffs theorize further that trade is restrained since the rates charged are "unreasonable" and thus, the continued operation and expansion of CATV services was affected substantially. However, we are unpersuaded by this theory, as the record shows that notwithstanding allegedly "unreasonable" rates several CATV operators continued to operate and expand into areas subject to the new rate.

Accordingly, we conclude that the exchange of price information did not constitute a conspiracy or combination with an intent to fix pole attachment rates or unreasonably restrain trade. Therefore, the district court did not err in rejecting plaintiffs' § 1 claim.

### III.

Plaintiffs contend also that defendants violated § 2 of the Sherman Act by establishing and maintaining "unreasonable, unjustifiable and artificial pole attachment rates." Plaintiffs surmise that such pricing conduct constituted an abuse of monopoly power held by defendants over utility service poles in Ohio. The district court rejected this claim, finding, inter alia, that plaintiffs failed to prove that the rates produced an anticompetitive effect or were established and maintained for an anticompetitive purpose. We agree.

■ Section 2 of the Sherman Act makes it unlawful to monopolize or attempt to monopolize any part of interstate or foreign commerce. 15 U.S.C. § 2. "Monopoly power is the power to control prices or exclude competition." *United States v. E.I. duPont de Nemours & Co.,* 351 U.S. 377, 391, 76 S.Ct. 994, 1005, 100 L.Ed. 1264 (1956). *See Byars v. Bluff City News Co., Inc., (Byars II ),* 683 F.2d 981, 982 (6th Cir.1982), quoting *United States v. Grinnell Corp.,* 384 U.S. 563, 571, 86 S.Ct. 1698, 1704, 16 L.Ed.2d 778 (1966). However, the mere possession of a lawfully acquired monopoly power in a particular product and market is not a *per se* violation of § 2. *See Grinnell Corp., supra,* 384 U.S. at 570–71, 86 S.Ct. at 1703–04; *Byars v. Bluff City News Co., Inc. (Byars I ),* 609 F.2d 843, 853 (6th Cir.1979). *See also Lamb Enterprises, Inc. v. Toledo Blade Co.,* 461 F.2d 506, 515 (6th Cir.), *cert. denied,* 409 U.S. 1001, 93 S.Ct. 325, 34 L.Ed.2d 262 (1972). It is the use of monopoly power "to foreclose competition, to gain a competitive advantage, or to destroy a competitor" that is unlawful. *United States v. Griffith,* 334 U.S. 100, 107, 68 S.Ct. 941, 945, 92 L.Ed. 1236 (1948). Accordingly, to avoid the proscriptions of § 2, the monopolist must refrain from conduct having an anticompetitive purpose or effect. *See generally International Salt Co., Inc. v. United States,* 332 U.S. 392, 396, 68 S.Ct. 12, 15, 92 L.Ed. 20 (1947) (It is "unreasonable, *per se,* to foreclose competitors from any substantial market."); *Smith, supra,* 703 F.2d at 954 (To succeed on a monopolization claim "plaintiffs must establish the relevant product and geographic markets in which they *compete* with the alleged monopolizers.") (emphasis added); *Byars I, supra,* 609 F.2d at 853 (Section 2 is violated when a "monopolist abuses its monopoly power and acts in an unreasonably exclusionary manner vis-a-vis *rivals or potential rivals.*") (emphasis added); *Berkey Photo, Inc. v. Eastman Kodak Co.* 603 F.2d 263, 294 (2d Cir.1979) (To recover under § 2, it must be demonstrated "that the monopolist has engaged in some anticompetitive conduct."), *cert. denied,* 444 U.S. 1093, 100 S.Ct. 1061, 62 L.Ed.2d 783 (1980).

■ There is no credible dispute that defendants enjoy a lawful, natural monopoly over the relevant product and geographic

markets. *See Otter Tail Power Co. v. United States,* 410 U.S. 366, 369, 93 S.Ct. 1022, 1025, 35 L.Ed.2d 359, *reh'g denied,* 411 U.S. 910, 93 S.Ct. 1523, 36 L.Ed.2d 201 (1973); *Byars I, supra,* 609 F.2d at 853 n. 27. Therefore, our inquiry is limited to whether defendants abused their lawfully acquired monopoly power by engaging in some type of anticompetitive conduct. *See generally Berkey Photo, Inc., supra,* 603 F.2d at 273–75.

The crux of plaintiffs' § 2 claim is that defendants' establishment and maintenance of "unreasonable, unjustifiable and artificial" rates is conclusive to the finding of anticompetitive conduct. This argument is strained. The short answer is that the district court expressly concluded that the $5.60 rate was reasonable in its August 13, 1981 Memorandum, finding for defendants on their pendent counterclaim. Since plaintiffs do not advance any plausible argument challenging the district court's ruling on the pendent counterclaim, we are unwilling to disturb the finding of reasonableness.

Even "assuming" that the pole rates were unreasonable, this would not in itself be conclusive of an anticompetitive purpose or effect. *See, e.g., Berkey Photo, Inc., supra,* 603 F.2d at 294 ("But unless the monopoly has bolstered its power by wrongful actions, it will not be required to pay damages merely because its prices may later be found excessive. Setting a high price may be a use of monopoly power, but it is not in itself anticompetitive."). Moreover, and of critical importance, we are persuaded that the rates established by defendants were not designed "to foreclose competition, to gain a competitive advantage, or to destroy a competitor." *Griffith, supra,* 334 U.S. at 107, 68 S.Ct. at 945. The record reveals unequivocally that there was no proof of any competition which could have been so affected. Defendants do not compete with other utilities for cable attachment rentals. Additionally, the parties stipulated that de-

fendants do not compete with CATV companies. Further, there is no concrete evidence of any actual or potential competition among plaintiffs and the alleged coconspirators. Consequently, such findings demonstrate that there was no competition to be foreclosed or otherwise affected.[3] *Cf. Griffith, supra,* 334 U.S. at 107, 68 S.Ct. at 945; *Smith, supra,* 703 F.2d at 955; *Berkey Photo, Inc., supra,* 603 F.2d at 294, 296. Therefore, for all of the above reasons, we conclude that defendants did not engage in any anticompetitive conduct in violation of § 2 of the Sherman Act.

Accordingly, the judgment of the district court is affirmed. The costs are assessed against appellants.

---

3. We are not unmindful of the decision in *TV Signal Co. of Aberdeen v. American Telephone & Telegraph,* 617 F.2d 1302 (8th Cir.1980) (finding defendant telephone companies competitors with plaintiff CATV company). However, in that case the proof was overwhelming as to the existence of competition between the parties. *See* 617 F.2d at 1309–10. Given the lack of proof in the case at bar that defendants had any interest in the broad band communications area, we find *TV Signal Co. of Aberdeen* inapposite to the present case.