*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2001 FED App. 0164P (6th Cir.)
File Name: 01a0164p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

———————————

UNITED STATES OF AMERICA,
　　　　*Plaintiff-Appellee,*

　　　*v.*　　　　　　　　　　　No. 99-5111

DAVID P. TRUE,
　　　　*Defendant-Appellant.*

Appeal from the United States District Court
for the Western District of Kentucky at Owensboro.
No. 97-00011—Joseph H. McKinley, Jr., District Judge.

Argued: April 28, 2000

Decided and Filed: May 17, 2001

Before: GUY, BOGGS, and SUHRHEINRICH, Circuit
Judges.

———————————

**COUNSEL**

**ARGUED:** Leslie W. Jacobs, THOMPSON, HINE &
FLORY, Cleveland, Ohio, for Appellant. Nancy C. Garrison,
UNITED STATES DEPARTMENT OF JUSTICE,
ANTITRUST DIVISION, Washington, D.C., for Appellee.
**ON BRIEF:** Leslie W. Jacobs, Thomas F. Zych, Geoffrey S.
Mearns, Kenneth G. Cole, THOMPSON, HINE & FLORY,
Cleveland, Ohio, for Appellant. Nancy C. Garrison, John J.

1

Powers, III, UNITED STATES DEPARTMENT OF JUSTICE, ANTITRUST DIVISION, Washington, D. C., for Appellee.

————————————

**OPINION**

————————————

SUHRHEINRICH, Circuit Judge.  The Hyde Amendment authorizes reasonable attorney fees and litigation expenses to a prevailing party in a criminal case if a court finds that the government's position was "vexatious, frivolous, or in bad faith."  Pub. L. No. 105-109, § 617, 111 Stat. 2519 (1997), *reprinted in* 18 U.S.C. § 3006A, Historical and Statutory Notes (hereinafter "18 U.S.C. § 3006A, Statutory Notes").[1]

---

[1]In its entirety, the Hyde Amendment provides:

During fiscal year 1998 and in any fiscal year thereafter, the court, in any criminal case (other than a case in which the defendant is represented by assigned counsel paid for by the public) pending on or after the date of the enactment of this Act [Nov. 26, 1997], may award to a prevailing party, other than the United States, a reasonable attorney's fee and other litigation expenses, where the court finds that the position of the United States was vexatious, frivolous, or in bad faith, unless the court finds that special circumstances make such an award unjust. Such awards shall be granted pursuant to the procedures and limitations (but not the burden of proof) provided for an award under section 2412 of title 28, United States Code.  To determine whether or not to award fees and costs under this section, the court, for good cause shown, may receive evidence ex parte and in camera (which shall include the submission of classified evidence or evidence that reveals or might reveal the identity of an informant or undercover agent or matters occurring before a grand jury) and evidence or testimony so received shall be kept under seal.  Fees and other expenses awarded under this provision to a party shall be paid by the agency over which the party prevails from any funds made available to the agency by appropriation.  No new appropriations shall be made as a result of this provision.

Pub. L. No. 105-119, § 617, 111 Stat. 2519 (1997).

to cross-examination regarding his plea agreement and other matters.  True has not shown that the Government acted improperly or that it constitutes vexatiousness or bad faith justifying an award of attorney fees under the Hyde Amendment.  On this record, True has simply not shown that the Government lacked probable cause to indict him or that it consciously pursued the action out of ill will towards him.

The district court sat through a trial lasting more than two weeks.  It was in the unique position of personally viewing the demeanor of all the witnesses and being able to judge their credibility.  It was also in the unique position of personally viewing the Government's conduct in this case.  It is for these reasons that an abuse of discretion standard is so peculiarly appropriate.  We find that, on this record, the district court did not abuse its discretion in denying True's Hyde Amendment application.

Given this outcome, we need not address True's alternative argument to remand for an evidentiary hearing.

### V.  Conclusion

Accordingly, because True did not meet his burden of showing that the Government's position was vexatious or in bad faith, we **AFFIRM** the district court's denial of True's application for attorney's fees and expenses under the Hyde Amendment.

Government's position was vexatious or in bad faith under the Hyde Amendment.

## C. Trial Tactics

True also argues that certain trial conduct by the Government constituted vexatiousness or bad faith justifying an award under the Hyde Amendment. For instance, True asserts that the Government's use of Bussey's testimony (about the alleged conversation between Caldwell and True that Longmire discussed with Bussey) and the failure of the Government to call Longmire or Caldwell as witnesses, despite its knowledge of arguably contradictory statements given by the declarants, was a vexatious or bad faith position. The Government had provided True with the statements of Longmire and Caldwell in *Brady* material. True could have called Longmire or Caldwell as witnesses to exonerate himself. He chose not to call them. Thus, we find this basis for True's Hyde application meritless.

We likewise reject True's argument that the Government deliberately misled Porter and Mechtenberg at trial by selectively withholding certain facts during questioning, and that this constituted vexatious or bad faith conduct. True had ample opportunity to cross-examine these witnesses and his counsel did, in fact, extensively cross-examine True's subordinates regarding the various evidence about which he now complains. Thus, we also find this basis for True's Hyde application meritless.

True further argues a Hyde award was proper because the Government coerced Mechtenberg. For example, True claims that Mechtenberg admitted his own role only after the Government threatened to indict him, that Mechtenberg implicated True only after the Government threatened to imprison him, and that the Government required Mechtenberg to testify consistently with his statements during the investigation. Here, Mechtenberg was not prohibited by the terms of his plea agreement from testifying about True, and the plea agreement was available to True's counsel. Moreover, Mechtenberg did, in fact, testify and was subject

Defendant David P. True ("True") appeals from the denial of his application for attorney's fees and expenses under the Hyde Amendment, following his acquittal by a jury of price-fixing conspiracy charges in violation of § 1 of the Sherman Act, 15 U.S.C. § 1. True claims he is entitled to fees and expenses under the Hyde Amendment because the Government prosecuted him outside the applicable statute of limitations, lacked sufficient proof of the charges against him to proceed with the prosecution, and engaged in a variety of misconduct during trial. The Government responds that this appeal is barred because True failed to comply with all the requirements under the Equal Access to Justice Act, 28 U.S.C. § 2412 *et seq.* ("EAJA"), which the Hyde Amendment incorporates, asserting that these requirements are jurisdictional. Also at issue is the proper standard of review for decisions on Hyde Amendment applications.

For the following reasons, we **AFFIRM.**

## I. Background

In December 1992, the Government began investigating alleged antitrust violations in the commercial explosives industry. The antitrust violations began in 1988 with a conspiracy to fix prices and rig bids. The investigation involved manufacturers and distributors of commercial explosives serving the areas of western Kentucky, southern Indiana, and southern Illinois (the "Western Kentucky Region"). By late September 1996, four corporate conspirators and several of fifteen individual conspirators had waived indictment and had pleaded guilty to informations charging conspiracy. However, the Government waited until September 3, 1997, to indict True, a vice president of one of the corporate conspirators, on one count of conspiring to unreasonably restrain interstate trade and commerce in violation of § 1 of the Sherman Act. There is a five-year statute of limitations for such charges. *See* 18 U.S.C. § 3282.

The Indictment alleged True engaged in a conspiracy beginning "sometime in the Fall 1988 and continuing at least until sometime in 1993." The Indictment stated that the

conspiracy involved a single, continuing agreement to (1) rig bids for the sale of commercial explosives, (2) fix prices for explosives products, (3) allocate customers in the Western Kentucky Region, and (4) receive payments for these sales. The district court, at True's request, ordered the Government to provide True with a Bill of Particulars identifying the specific bids, prices, products, and customers that were the basis for the allegations in the Indictment. The Bill of Particulars' allegations regarding increases in annual price lists alleged that the price-fixing conspiracy extended into 1993, and that the conspiracy as to price increases for ammonium nitrate combined with fuel oil ("ANFO") extended into late 1992.

The Government alleged that four companies were part of the conspiracy: True's employer, Austin Powder Company (Austin), an explosives manufacturer; ICI Explosives USA, Inc. (ICI), and Dyno Nobel, Inc. (Dyno) (formerly IRECO), also manufacturers; and Mine Equipment & Mill Supply, Inc. (MEMSCO), a distributor. All four corporate conspirators waived indictment and pleaded guilty. The ICI, Dyno, and MEMSCO plea agreements were filed in August and September 1995. The Austin plea agreement was not filed until September 1996, almost one year prior to True's Indictment on September 3, 1997. The plea agreements with ICI, Dyno, and MEMSCO stated that the conspiracy lasted "from late 1988 until mid-1992." These companies pleaded guilty to a conspiracy involving price-fixing of commercial explosives. Austin's plea agreement similarly indicated the conspiracy involved price-fixing of commercial explosives, but stated that the conspiracy lasted "from Fall 1988 until at least mid-1992."

Although some of the individual co-conspirators were given immunity in exchange for their cooperation and testimony, several of them pleaded guilty to the antitrust conspiracy, including Thomas Mechtenberg, one of True's subordinates at Austin. Mechtenberg's plea agreement indicated that the conspiracy lasted "from Fall 1988 until mid-1992." The Mechtenberg plea agreement, like the Austin plea agreement,

is amplified by some testimony that the conspiracy ended by mid-1992 or earlier, and that the Government entered into tolling agreements with Drury and Westmaas. Furthermore, witnesses could no longer recall specific events or when they occurred — the very evil that limitation periods are meant to address.

However, there was evidence to support the Government's position that the conspiracy extended into late 1992 and even into 1993. For example, Porter implicated True in the November 1992 ANFO increase. Moreover, Kiser, a competitor, admitted speaking with both of True's subordinates, as well as another competitor, about this increase, which was eventually passed on to customers. Further, once established, a conspiracy "is presumed to continue until there is an affirmative showing that it has been abandoned." *United States v. Hayter Oil Co.,* 51 F.3d 1265, 1270-71 (6th Cir. 1995). Even if True were not aware of all the conversations, he is nonetheless liable for the acts of other conspirators performed in furtherance of their agreement, absent proof that he has withdrawn from the agreement. *See id.* at 1271. Withdrawal requires a showing that a defendant affirmatively acted to defeat or disavow the conspiracy's purpose. *See United States v. Lash*, 937 F.2d 1077, 1083 (6th Cir. 1991). "Mere cessation of activity is not enough." *Id.* Here, even if the conspirators at some point in 1992 agreed to no longer *discuss* pricing and bidding, there was no effective withdrawal by any co-conspirator because they continued to *act* based on their prior discussions when they passed on to customers the November 1992 ANFO increase. The record contains no evidence that any of the conspirators, let alone True, acted to defeat or disavow their illegal purpose. In fact, Porter's testimony shows that True was aware his subordinates were discussing upcoming prices with competitors, but never dissuaded them from having such discussions. In short, because there was evidence to support a finding that the conspiracy continued past September 1992, we cannot say that the Government lacked probable cause in pursuing this prosecution, or that it did so out of ill will towards True. Again, True has failed to demonstrate that the

what competitors were planning on bidding, and testified that he had advised True that Mechtenberg was discussing upcoming prices with competitors. Such facts gave the Government probable cause to prosecute True.

Of course, in the end, the jury did not find the charges proved beyond a reasonable doubt. Given inconsistencies in the record and the inability of witnesses to recollect events, this result is not surprising. Yet acquittal alone is not the standard for an award under the Hyde Amendment. On this record, True has simply failed to demonstrate that the Government lacked probable cause in bringing the Indictment so that it could be said the Government vexatiously prosecuted True for purposes of the Hyde Amendment. True has likewise failed to show that the Government consciously pursued the action out of ill will towards him so that it could be said that the Government acted in bad faith.

We turn now to True's statute of limitations argument. Here, he argues that the Government's decision to prosecute him knowing that the limitations period had run constituted vexatiousness or bad faith.

## B.  Statute of Limitations

Statutes of limitations are intended "to limit exposure to criminal prosecution to a certain fixed period of time following the occurrence of those acts the legislature has decided to punish by criminal sanctions." *Toussie v. United States*, 397 U.S. 112, 114 (1970). These limitations are "designed to protect individuals from having to defend themselves against charges when the basic facts may have become obscured by the passage of time and to minimize the danger of official punishment because of acts in the far-distant past." *Id.* at 114-15.

We have some concerns about the Government's delay in indicting True in light of the fact that other conspirators entered plea agreements one to two years before True's indictment and that these agreements almost universally stated that the conspiracy lasted until mid-1992. Our concern

was filed in late September 1996, almost one year prior to True's Indictment. Shortly after Mechtenberg signed his plea agreement, the Government filed an information against him that alleged the conspiracy continued "at least into mid 1992."

The Government also entered into tolling agreements regarding the statute of limitations with two of the individual co-conspirators, Donald J. Westmaas and Frederick C. Drury,[2] who were associated with Econex, an explosives distributor. Both of these agreements tolled the period May 21, 1997 through June 20, 1997. The Government ultimately did not charge Drury, who was granted immunity for his testimony. Westmaas, on the other hand, entered into a plea agreement in which he waived indictment and agreed to plead guilty to an information charging only a conspiracy involving rigging a bid for the sale of explosives. The Westmaas plea agreement was filed July 30, 1997. Ultimately, only True went to trial.

Evidence at trial showed that prices for commercial explosives in the Western Kentucky Region were depressed because of a price war between two brothers who owned competing companies in the industry. After the brothers sold their companies, some of the remaining competitors agreed to fix prices and rig bids in order to boost prices. This agreement was memorialized in December 1988, when Marty Vincent, a salesman at Econex, took a telephone message for his supervisor from David Childs, at Midland Powder Company, a competitor. The message indicated that Childs had spoken with a "connection" at Austin and West Kentucky Explosives ("WKE"), and that they were willing to agree for three months that: "[a]nything we price to a non customer while trying to get prices increased we will be giving a highball price. We will try to give a $5 to $10 higher price on Anfo per ton." The message also included information about

---

[2] Econex was acquired by Midland Powder Company (Midland) in 1987, a holding company half-owned by David Childs, formerly of Austin, and half-owned by Dyno. Midland also eventually owned MEMSCO. Drury was later a vice president of Dyno.

what certain distributors were going to bid for various products at specific accounts and asked for a return call advising of Econex's intentions.

Regarding this initial three-month agreement, John Bussey, of WKE, testified that in December 1988 his supervisor, Joseph Y. Longmire, said that he had spoken with Childs and that Childs indicated they needed to raise prices. Bussey also testified that Longmire said Withers Waller Caldwell, the vice president of WKE's parent company, ICI, "could take care of True" at Austin. Bussey indicated that Longmire later said that Austin had been "taken care of." Bussey thought that this meant Caldwell spoke with True, but he admitted that he had no personal knowledge whether the conversation took place.[3]

Childs testified regarding the initial agreement and stated that he spoke with Bussey and Mechtenberg in December 1988. He indicated that they discussed specific bids and price increases at specific accounts and that he then attempted to contact Econex, leaving the message with Vincent. However, Childs indicated that, to his knowledge, True was never part of the original three-month agreement.

Mechtenberg, on the other hand, implicated True in the initial agreement by testifying that he spoke with True in December 1988 after Childs initially contacted him, that he told True that Childs shared bid prices with him, and that True indicated they should bid higher. Their company ultimately submitted a higher bid than Childs' company. Childs' company won the ANFO portion of the bid, while Austin won another portion of the bid. On cross-examination, Mechtenberg acknowledged that he could not remember when

---

[3] This line of testimony was the subject of an objection by True because the Government had submitted *Brady* material prior to trial revealing that Longmire and Caldwell either denied or had no recollection of this conversation implicating True in the initial three-month agreement. The Government did not call Longmire or Caldwell as witnesses. True objected under Rule 403 on the ground that it would mislead the jury and be unfairly prejudicial to him.

coerced its key witness, and that this constituted vexatious or bad faith conduct. These latter arguments can be classified as involving the Government's trial tactics.

## A. Decision to Prosecute

To prove a conspiracy under § 1 of the Sherman Act, the government must prove that (1) the defendant entered into a contract, combination or conspiracy, and (2) the contract, combination or conspiracy amounted to an unreasonable restraint of trade or commerce among the several States. *Cont'l Cablevision v. Am. Elec. Power Co.*, 715 F.2d 1115, 1118 (6th Cir. 1983). Dissemination of price information alone, without a purpose to restrain competition, does not offend the Act. *See id.* at 1118-19. Similarly, absent an unlawful purpose, a company may examine and consider in the establishment of its own rates, the rates charged by similar companies in the industry. *See id.* at 1119.

Admittedly, the record shows that many of the discussions between the competitors were simply legitimate, after-the-fact, price verifications and not agreements to fix prices, rig bids, or allocate customers, such as that testified to by Westmaas. At the same time, however, despite conflicting testimony, True's competitors and both of his subordinates testified that the conspirators discussed pricing increases prior to making announcements, that these discussions were for unlawful purposes, and that True personally participated in some of the discussions. For example, Bussey, a competitor, testified that his boss indicated that True's company had been "taken care of," implying that Caldwell spoke with True personally about such matters in 1988. Drury, another competitor, testified that he personally spoke with True about upcoming prices and bidding issues. In addition, True's subordinate Mechtenberg testified that he spoke with True about his conversations with a competitor in 1988. He also discussed with True his later conversations regarding surcharges with the same competitor, surcharges which were ultimately passed through to customers in 1993. Porter likewise described his conversations with True regarding

## IV.  Merits

The Hyde Amendment does not define what constitutes a government position that is "vexatious" or "in bad faith."[10] *See* 18 U.S.C. § 3006A, Statutory Notes.  The Fourth and Eleventh Circuits have looked to Black's Law Dictionary to define these terms.  *See Gilbert*, 198 F.3d at 1298-99; *In re 1997 Grand Jury*, 215 F.3d at 436 (following *Gilbert*).  "Vexatious" is defined as "without reasonable or probable cause or excuse."  Black's Law Dictionary 1565 (6th ed. 1990).  "Bad faith" is defined as "not simply bad judgment or negligence, but rather it implies the conscious doing of a wrong because of dishonest purpose or moral obliquity; . . . it contemplates a state of mind affirmatively operating with furtive design or ill will."  *Id.* at 139.  Thus, as the Eleventh Circuit remarked, the Hyde Amendment "places a daunting obstacle before defendants who seek to obtain attorney fees and costs from the government following a successful defense of criminal charges."  *Gilbert*, 198 F.3d at 1302-03.

Here, the district court concluded, without elaboration, that True was "not entitled to fees and expenses because the position of the United States in pursuing this prosecution was not vexatious, frivolous, or in bad faith."  True submits that this ruling was erroneous.  Specifically, True argues that the prosecution was vexatious or in bad faith because the Government knew there was insufficient evidence to prove beyond a reasonable doubt that True was a member of the conspiracy, but proceeded anyway.  He also argues that the September 1997 prosecution was vexatious or in bad faith because the five-year statute of limitations had run and the Government knew the prosecution was barred.  In addition, True argues that the Government used hearsay testimony despite its knowledge of contradictory statements given by the declarants and this amounted to a vexatious or bad faith position.   Finally, True argues that the Government deliberately misled key witnesses by withholding facts and

---

[10]True does not argue that the Government's position was frivolous.

he spoke with True about these matters.  He testified on re-direct examination, however, that he had previously stated, in a document prepared for sentencing purposes in his own case, that True asked him to contact Childs in December 1988 to find out what Childs would bid on a particular account.  Yet, on re-cross examination, Mechtenberg acknowledged that during the Department of Justice (DOJ) investigation he had repeatedly denied True was involved and admitted that he only implicated True when it became apparent that he would face imprisonment unless he could help the Government make a case against someone else.  He also acknowledged that his plea agreement contained a unique clause requiring him to testify consistently with the information he provided to the Government prior to executing the plea agreement or face prosecution for his role in the conspiracy, perjury, or other offenses.

The various distributors largely retained their current customers after the initial three-month agreement, and the record shows they continued to contact each other prior to bidding and raising prices.  Testimony and documentary evidence showed that price increases by the various companies were identical or nearly so for ANFO and various surcharges.  While there was competition for new business, customers were generally retained by the companies that initially serviced the accounts, which comported with the agreement to allocate customers in the region.

Mechtenberg and Richard Porter, True's subordinates, also implicated True in the ongoing conspiracy.  For instance, Mechtenberg stated that he told True that Childs was increasing a surcharge for blasting services, that Austin would increase their surcharge by a like amount, that True thought this was a good idea, and that True authorized him to make the change.  This charge was passed through to customers through part of 1993.  Porter also cited an example of when he informed True that he had "agreed" with Childs to raise the price on ANFO.  Porter further indicated that True would ask what competitors were planning on bidding, that if Porter did not know the answer he would find the information for True,

and that, when he later conveyed the information to True, he made it clear his source of information was a competitor. In addition, Porter testified that when he informed True that Mechtenberg was talking to Bob Kiser at WKE, True did not instruct him to stop Mechtenberg from talking to competitors about upcoming prices. Likewise, True never told Porter to cease discussing upcoming prices with competitors.

Competitors also testified about their discussions with True during the conspiracy. For example, Drury admitted that he personally discussed upcoming prices and bidding issues with True. Drury also said that on one occasion he suggested True talk to Childs about a specific account. Drury indicated that Childs later called and said he had spoken with True about the pricing increase and that True said Austin would increase the particular surcharge discussed.

Westmaas, however, although he acknowledged personally verifying prices with True, denied conspiring with True. Westmaas also denied knowing that his employees spoke with True. Westmaas admitted receiving a call from Caldwell in the Spring of 1991, and that he sensed Caldwell wanted him to solicit True for an increase in regulatory compliance surcharges. But Westmaas denied contacting True. Westmaas also said he did not know if Drury contacted True at that time.

In November 1992, MEMSCO, WKE, and Austin issued ANFO increases in the same amount. Kiser admitted that he spoke with competitors Childs, Mechtenberg, and Porter prior to this increase. It appears this conversation took place in either August or October of 1992. Mechtenberg also admitted to having a conversation with either Childs or Kiser prior to November 1, 1992, but he could not recall with whom or the exact date. Porter likewise admitted to coordinating this November 1992 increase with Childs and informing True that they had agreed to the increase. However, on cross-examination, Porter indicated that he based this testimony on a price increase letter dated November 1992 and that, if there were an identical increase in May 1992, he could not be

---

(quoting *Miller v. Fenton*, 474 U.S. 104, 114 (1985)). In particular, the Court discussed how some decisions "turned on a determination that, as a matter of sound administration of justice, one judicial actor is better positioned than another to decide the issue in question." *Id.* Similar considerations counsel our use of the same deferential standard of review for a district court's Hyde Amendment decisions. Not only do district court judges hear the testimony of witnesses and see their demeanor, but they also personally view the conduct of the Government throughout its prosecution of the charges against the acquitted defendant.

Other Circuits have also relied on *Pierce* and have also adopted an abuse of discretion standard for review of district court determinations in Hyde Amendment cases. *See United States v. Lindberg*, 220 F.3d 1120, 1124 (9th Cir. 2000); *United States v. Truesdale*, 211 F.3d 898, 905-06 (5th Cir. 2000); *United States v. Gilbert*, 198 F.3d 1293, 1297-98 (11th Cir. 1999); *see also In re 1997 Grand Jury*, 215 F.3d 430, 436 (4th Cir. 2000) (citing *Gilbert* without elaboration). Moreover, we generally review district court decisions regarding attorney fees in other contexts under such a deferential standard. *See*, *e.g.*, *Owner-Operator Indep. Drivers Ass'n, v. Bissell*, 210 F.3d 595, 597 (6th Cir. 2000) (involving denial of attorney fees in civil rights action under 42 U.S.C. § 1988); *Adcock-Ladd v. Sec'y of Treasury*, 227 F.3d 343, 348-49 (6th Cir. 2000) (involving an award of attorney fees in an employment discrimination action under 42 U.S.C. § 2000e).[9] Thus, we hold that district court decisions on Hyde Amendment applications are reviewed for an abuse of discretion.

---

[9]An abuse of discretion occurs when the lower court "relies on clearly erroneous findings of fact, or when it improperly applies the law or uses an erroneous legal standard. An abuse of discretion may also be found when the reviewing court is firmly convinced that a mistake has been made," i.e., when we are left with "a definite and firm conviction that the trial court committed a clear error of judgment." *Adcock-Ladd*, 227 F.3d at 349 (quotations omitted) (citations omitted).

### III.  Standard of Review

The parties contest the appropriate standard of review for a district court's decision whether to grant or deny attorney fees pursuant to the Hyde Amendment.  True argues for *de novo* review.  The Government argues for an abuse of discretion. In dicta, we recently indicated that such a decision is reviewed for an abuse of discretion standard.  *See United States v. Ranger Elec. Communications, Inc.*, 210 F.3d 627, 631 (6th Cir. 2000) (citing *Pierce v. Underwood*, 487 U.S. 552 (1988)).  For the following reasons, we now make that ruling explicit.

As we indicated in *Ranger*, and as discussed *supra*, the Hyde Amendment incorporates the procedures and limitations of the EAJA.  *See id.* at 633.  However, the Hyde Amendment does not provide a standard of review.  We will therefore look to other contexts where attorney fees are awarded.  Because the obvious analogy is to the EAJA, we begin by examining *Pierce*, the leading case on review of attorney's fees under the EAJA.

In *Pierce*, the Supreme Court held that the proper standard of review for district court determinations of attorney fees sought under the EAJA is an abuse of discretion.  *Pierce*, 487 U.S. at 562-63.  The *Pierce* Court emphasized that a district court had full knowledge of the factual setting at issue in an EAJA application and that such knowledge could only be acquired by an appellate court at the unusual expense of reviewing the entire record.  *Pierce*, 487 U.S. at 559-60

---

Appellate Procedure 4(a) applies to appeals from Hyde Amendment rulings); *United States v. Robbins*, 179 F.3d 1268, 1270 (10th Cir. 1999) (holding Federal Rule of Appellate Procedure 4(b) governs); *see also United States v. Holland*, 214 F.3d 523, 525 (4th Cir. 2000) (Hyde Amendment proceedings are civil in nature).  The order denying True's Hyde Amendment application was entered on January 8, 1999.  True's notice of appeal was filed on January 15, 1999.  We need not resolve this issue here because True's notice of appeal was timely filed under the criminal or civil appellate rules so that we have jurisdiction.  *Compare* Fed. R. App. P. 4(a), *with* Fed. R. App. P. 4(b).

certain when the discussion took place.  Childs testified that he spoke with Austin representatives about the November 1992 ANFO increase in order to coordinate the price, but he did not name the person with whom he spoke.

Despite this testimony regarding conversations and activities in late 1992, the conspirators dated the end of the agreement differently.  Childs dated the conspiracy as having ended when investigations began, but his testimony was both ambiguous and contradictory.  There were two different investigations, a Federal Trade Commission (FTC) investigation[4] in Spring 1992 and the DOJ investigation in late 1992.  Childs testified on direct examination that the agreement ended with the DOJ investigation, but his prior testimony before a Grand Jury in March 1995 consistently stated that the agreement ended in the Spring.  He explained his inconsistency as resulting from confusion between the two investigations.  After an overnight recess, Childs then denied that Mechtenberg or Porter told him prior to the end of 1992 that they could no longer discuss future price increases or upcoming bids, despite his previous day's testimony and his prior Grand Jury testimony about the end of the agreement in which Childs provided significant details about a meeting he had with Mechtenberg at a Shoney's restaurant in Spring 1992.

Mechtenberg similarly associated the end of the agreement with a meeting he had with Childs at a Shoney's restaurant.  However, Mechtenberg testified that this occurred in late 1992 when subpoenas were issued.  Mechtenberg also testified that he agreed to plead guilty to participating in a conspiracy until mid-1992, that he and the Government disagreed about the ending point, and that the end of the conspiracy was the subject of a heated debate with the Government during plea negotiations.  Porter also gave conflicting testimony about the end of the agreement,

---

[4]The FTC investigation involved a proposed joint venture between IRECO and Atlas Powder Company, now ICI, regarding a dynamite manufacturing plant, an issue that was not part of the DOJ investigation.

ultimately acknowledging that he was not a witness capable of saying when the agreement ended. Kiser associated the end of the conspiracy with receipt of subpoenas in late December 1992.

True moved for acquittal after the prosecution rested its case, but the district court reserved ruling on the motion. True renewed his motion at the close of all proofs. The court again reserved ruling on his motion, stating that, "I have some questions about the Government's proof, not enough to make up my mind about it right now, but I want to see what the jury's going to do. If they convict then I'm going to look at the transcripts and take a good hard look at the judgment."

After the two and one-half week trial, the jury returned a verdict of not guilty. The judgment of acquittal was entered on September 22, 1998. On October 22, 1998, True filed his application for attorney's fees and expenses under the Hyde Amendment. True's application failed to allege his net worth and did not provide an itemized statement from his attorneys or experts as required by 28 U.S.C. §2412(d)(1)(B), incorporated by reference into the Hyde Amendment. *See* 18 U.S.C. § 3006A, Statutory Notes. The Government moved to dismiss the application, arguing that (1) it was jurisdictionally defective; and (2) True failed to meet his burden of showing that the Government's position was vexatious, frivolous, or in bad faith. The district court denied True's application on the merits. It then denied the Government's motion to dismiss for lack of jurisdiction as moot.

True appeals. We turn first to the jurisdictional question.

## II. Subject Matter Jurisdiction

The Government contends that True's Hyde Amendment application was jurisdictionally defective because it did not conform to the requirements set forth in the Equal Access to Justice Act, 28 U.S.C. § 2412 *et seq.* ("EAJA"), which the Hyde Amendment incorporates. *See* 18 U.S.C. § 3006A, Statutory Notes. True responds that this issue is not properly before this Court because the Government failed to file a

at 1383-84 (involving an applicant who timely filed his fee application but failed to allege he was an eligible party by stating his net worth); *Singleton*, 231 F.3d at 858 (same). In both these cases, therefore, the courts ruled that the timely but flawed applications did not deprive the lower court of jurisdiction.

The *Singleton* court further emphasized that the EAJA was a partial waiver of federal sovereign immunity that required the court not to extend "the waiver beyond the limits set by Congress," while at the same time taking care not to "assume the authority to narrow the waiver that Congress intended." *Singleton*, 231 F.3d at 858. The *Singleton* court concluded that making the pleading requirements jurisdictional would be an undue narrowing of the sovereign immunity waiver. The court reasoned that the interests of the courts and the government in quick and fair resolutions of fee disputes would not be served if the requirements were jurisdictional because litigants would be tempted to demand high fees and include the greatest amount of expenses as a precautionary measure. *See id.* The court further reasoned that an applicant would be completely foreclosed from obtaining fees if a pleading failure were jurisdictional, a result also at odds with the EAJA's purpose. *See id.*

We find the reasoning of the Third, Eleventh, and Federal Circuits to be persuasive. Therefore, we likewise hold that the pleading requirements of § 2412(d)(1)(B), as incorporated by the Hyde Amendment, are not jurisdictional. Thus, the district court had subject matter jurisdiction because True timely filed his Hyde application.

Having satisfied ourselves that the district court had jurisdiction, we consider the merits of True's appeal. *See* 28 U.S.C. § 1291; Fed. R. App. P. 3(c), 4.[8]

---

[8] We note that there is a split among the Circuits regarding Hyde Amendment applications and whether appeals from decisions on such applications should be considered civil or criminal. *See United States v. Truesdale*, 211 F.3d 898, 904 (5th Cir. 2000) (holding Federal Rule of

[T]here are good reasons why the pleading requirements should be read as permitting some degree of flexibility. We know from our experience, both under the Equal Access to Justice Act and in other instances, of departure from the American Rule on fees that fee petitions must be prepared with great care because they are often hotly contested. Litigation over fee amounts has on some occasions been almost as protracted as the underlying lawsuit. Congress cannot have been unmindful of this reality. If we were to construe section 2412(d)(1)(B) [to make the pleading standards contained therein jurisdictional], the result would be to force counsel to demand the highest amount and include the largest number of hours and items of expense they could dream up. That would be so because the logic of the government's position as to the meaning of section 2412(d)(1)(B) would preclude any upward amendment of the petition after the expiration of the thirty-day filing period. It seems unlikely that Congress would have intended anything so inconsistent with sound administration and fair adjudication of fee disputes. Thus, we conclude that Congress did not intend that defects in the pleading requirements of section 2412(d)(1)(B) be treated as jurisdictional. So long as a fee petition is filed within the thirty-day period which puts the court, and eventually the government, on notice that the petitioner seeks fees under the Equal Access to Justice Act, the court may consider the petition, and may, absent prejudice to the government or noncompliance with court orders for timely completion of the fee determination, permit supplementation.

*Id.* at 104. Thus, the *Dunn* court held that the district court had subject matter jurisdiction because the application was timely filed. *See id.* at 104.

Relying on *Dunn*, both the *Bazalo* and *Singleton* courts distinguished between the filing period and pleading requirements of § 2412(d)(1)(B), and held that only the thirty-day filing requirement is jurisdictional. *See Bazalo*, 150 F.3d

cross-appeal. True's argument is without merit. Appellate courts must independently ascertain their own jurisdiction as well as the lower court's jurisdiction.[5]    *See Bender v. Williamsport Area Sch. Dist.*, 475 U.S. 534, 541 (1986). Further, matters raised below as alternative grounds in support of a judgment are properly before this Court even in the absence of a cross-appeal. *See United Food & Commercial Workers Union, Local 1099 v. S.W. Ohio Reg'l Transit Auth.*, 163 F.3d 341, 349 n.3 (6th Cir. 1998). Thus, we may properly review the Government's argument that the district court lacked jurisdiction to consider True's defective application for attorney's fees under the Hyde Amendment.

The Hyde Amendment explicitly incorporates the procedures and limitations provided for awards of attorney fees under the EAJA.[6]    *See* 18 U.S.C. § 3006A, Statutory Notes, *reproduced supra* note 1.

Under the EAJA,

A party seeking an award of fees and other expenses shall, within thirty days of final judgment in the action, submit to the court an application for fees and other expenses which shows that the party is a prevailing party and is eligible to receive an award under this subsection, and the amount sought, including an itemized statement from any attorney or expert witness representing or appearing in behalf of the party stating the actual time

---

[5]We note that the district court decided True's application on the merits without commenting about True's defective application and the implications for its own jurisdiction. True had indicated in his briefs below that he could properly supplement his application to include a net worth statement and itemization, if these were deemed necessary by the court. We, therefore, assume that True could have provided such supplementation to correct the defects in his application.

[6]The EAJA authorizes the award of attorneys' fees and costs to private parties who prevail against the government in civil actions. *See* 28 U.S.C. § 2412 *et seq.*

expended and the rate at which fees and other expenses were computed.

28 U.S.C. § 2412(d)(1)(B). A "party" is defined, in pertinent part, as "an individual whose net worth did not exceed $2,000,000" at the time the action was filed. 28 U.S.C. § 2412(d)(2)(B). However, the Hyde Amendment explicitly does not adopt the EAJA burden of proof. *See* 18 U.S.C. § 3006A, Statutory Notes. Instead, it requires the applicant to prove that the government's position was "vexatious, frivolous, or in bad faith." *Id.*[7] Thus, under the plain meaning of these provisions, an applicant must: (1) apply for fees and expenses within 30 days of the final judgment, (2) allege that the United States's position was vexatious, frivolous, or in bad faith, (3) allege that he prevailed, (4) allege that he is an eligible "party" under § 2412(d)(2)(B), (5) allege the amount sought, and (6) include an itemized statement from his attorney or expert stating the actual time spent and the rate at which the fees and expenses were computed.

Here, True timely filed his Hyde Amendment application within 30 days of the judgment of acquittal but failed to allege his net worth. In addition, although True listed his fees and expenses for which he was seeking reimbursement, his application did not include the required itemized statements from his attorneys or experts. The Government argues that True's failure to include these elements in his application deprived the district court of jurisdiction to consider True's application. The question before us, then, is whether the requirements set forth in § 2412(d)(1)(B), as incorporated by the Hyde Amendment, are jurisdictional or merely pleading requirements.

---

[7] Under the EAJA, a prevailing party must allege the government's position was "not substantially justified." 28 U.S.C. § 2412(d)(1)(B). However, under the EAJA it is the government's burden to prove that its position was substantially justified. *See, e.g.*, *Crawford v. Sullivan*, 935 F.2d 655, 658 (4th Cir. 1991); *United States v. 5,507.38 Acres of Land*, 832 F.2d 882, 883 (5th Cir. 1987).

We have held that the 30-day time period is jurisdictional in the EAJA context. *See Peters v. Sec'y of Health and Human Servs.*, 934 F.2d 693, 694 (6th Cir. 1991) (per curiam). Because the Hyde Amendment incorporates the EAJA procedures and limitations, there is no reason to conclude that the 30-day period is not also jurisdictional in the Hyde context. We have not, however, addressed whether the other requirements in the same sentence of § 2412(d)(1)(B) as the limitations period, which pertain to the contents of the application, are jurisdictional. In the EAJA context, three Circuits have ruled that they are simply pleading requirements. *See Singleton v. Apfel*, 231 F.3d 853, 858 (11th Cir. 2000) (per curiam) (involving an application for fees under the EAJA); *Bazalo v. West*, 150 F.3d 1380 (Fed. Cir. 1998) (same); *Dunn v. United States*, 775 F.2d 99 (3d Cir. 1985) (same). *But see Bazalo*, 150 F.3d at 1384 (Schall, J., dissenting) (noting that time limit and pleading requirements are found in a single sentence of the EAJA that contains mandatory language so that both requirements are jurisdictional; also noting that waivers of sovereign immunity must be strictly construed); *Dunn*, 775 F.2d at 105 (Adams, J., dissenting) (same); *United States v. Hopkins Dodge Sales, Inc.*, 707 F. Supp. 1078, 1080-81 (D. Minn. 1989) (order) (same; involving failure of applicant to allege it was an eligible party); *Sierra Club v. Brown*, No. 96-C-4768, 1999 WL 652047 (N.D. Ill. 1999) (memorandum opinion and order) (same; adopting *Dunn* and *Bazalo* dissents).

In *Dunn*, the applicants timely filed their attorney fee application but failed to specify the amount sought, and did not include the requisite itemization. *See Dunn*, 775 F.2d at 101. Affidavits subsequently filed, however, provided itemizations supported by detailed exhibits. *See id.* at 102. In holding that the district court had jurisdiction, the *Dunn* court distinguished two kinds of requirements in § 2412(d)(1)(B): a jurisdictional limitations period for filing and a pleading standard. *See id.* at 103. The *Dunn* court reasoned: